**FINRA DISPUTE RESOLUTION**

| |
|---|
| In the Matter of the Arbitration Between:<br><br>Michael L. Roluti and Lori C. Roluti, Alann R. App and Mare P. App, Sandra J. Aschert, William H. Batschelet, Jodi G. Duncan and Sheldon O. Duncan, Lynn E. Skinner Elliott and John G. Elliott, Rhonda S. Miracle, John Moody and Suzanna Moody, Dan Rolince and Christine Rolince, Diane L. Sanelli and Timothy Redmond, Lynn Alvin Sherratz, Audry D. Trahan, Jeffrey P. Van Buskirk and Kathleen M. Van Buskirk, and David S. Winters and Barbara A. Winters,<br><br>                   Claimants,<br>     v.<br>Cabot Lodge Securities, LLC and Craig Gould<br><br>             Respondents and Third-Party Claimants,<br><br>Ann Louise Werts (a/k/a Ann Vanderslice), Madison Avenue Securities, LLC, Dan Werts and Ashley Robinson,<br>            Third-Party Respondents. |

**FINRA Arb. No. 22-01460**

## RESPONDENT CRAIG COULD'S ANSWER
## TO THE FOURTH AMENDED STATEMENT OF CLAIM AND THIRD PARTY CLAIMS

       Respondent Craig Gould ("Gould"), by and through his attorneys, Gusrae Kaplan Nusbaum PLLC, hereby submits his Answer and Affirmative Defenses to the Fourth Amended Statement of Claim (the "4ASOC") filed on behalf of Michael L. Roluti and Lori C. Roluti, Alann R. App and Mare P. App, Sandra J. Aschert, William H. Batschelet, Jodi G. Duncan and Sheldon O. Duncan, Lynn E. Skinner Elliott and John G. Elliott, Rhonda S. Miracle, John Moody and Suzanna Moody, Dan Rolince and Christine Rolince, Diane L. Sanelli and Timothy Redmond, Lynn Alvin Sherratz, Audry D. Trahan, Jeffrey P. Van Buskirk and Kathleen M. Van Buskirk, and David S. Winters and Barbara A. Winters (the "Claimants"), pursuant to Rule 12303 of the Code of Arbitration Procedure for Customer Disputes (the "Code").

Gould, for the reasons set forth below, hereby asserts third party claims against Ann Werts (a/k/a Ann Vanderslice) ("Werts"), Madison Avenue Securities, LLC ("Madison"), Dan Werts ("D. Werts") and Ashley Robinson ("Robinson") pursuant to Rule 12303(b) for the reasons stated below.

## **GENERAL ANSWER**

It is respectfully submitted that the 4ASOC should be denied in its entirety. Gould denies the material allegations of the 4ASOC as they relate to any implied or actual liability for the alleged wrongdoing of Cabot Lodge Securities, LLC's ("Cabot Lodge") former associated person, Werts. Specifically, Gould denies any control person liability premised on any federal securities law ("FSL"), any FINRA Rules, violations of Regulation Best Interest, or any section of the Colorado Securities Act. Gould further denies control person liability for allegations that Cabot Lodge breached any fiduciary duty, breach of contract, negligence and negligent supervision, liability premised on *respondeat superior* or vicarious liability.

## **PRELIMINARY STATEMENT**

The 4ASOC does not alter any causes of action asserted by Claimants against Cabot Lodge, it only adds a cause of action premised on alleged control person liability against Cabot Lodge's Chief Executive Officer ("CEO"), Gould.  This late-in-the-game amendment to the Statement of Claim, which was already twice amended, is an attempt to harass and burden Gould to hold him personally liable for conduct by Werts. The control person liability claim will fail because Claimants will be unable to prove that Cabot Lodge engaged in any violations, and that Gould did not act in good faith. Thus, Gould cannot be held liable on the basis of control person liability.

Certain postulates are relevant herein:

1.   All investments carry risk;

2. Neither a broker-dealer nor its agents are insurers of an investment's performance; and

3. The structure, conduct and industry procedures of Cabot Lodge relating to sales of the L Bonds were more than reasonable and consistent with industry practices.

A close review of the relevant documentation and the L Bond's disclosure documents demonstrate that the business risk that caused GWG to file for bankruptcy was a risk specifically and continuously disclosed in GWG's registered filings and the offering documents.

The effort by Claimants to transfer the L Bond investment risk of their investment to Cabot Lodge, the broker-dealer, and now to hold Gould responsible on the basis of control person liability, is inconsistent with logic and law.

Anyone who would recognize liability to the broker-dealer and/or its control person under these specific circumstances threatens the fundamental economy of capital formation in the United States.

The L Bonds were not a scam nor a Ponzi scheme.  There is no allegation of wrongful taking of funds.  The 4ASOC is a further attempt by Claimants at a money-grab and to improperly hold Gould liable and the Panel should reject the 4ASOC.

Claimants have no *bona fide* claim for liability against Cabot Lodge or Gould for losses they may have incurred in connection with their investment in GWG Holdings, Inc. ("GWG") L Bonds (the "L Bonds") recommended by their representative, Werts[1].  Interestingly, Claimants did not name Werts, the individual who recommended the investment at issue in the claim.  Rather, Claimants sought a deep pocket and have alleged that only Cabot Lodge and now Gould are liable to them for damages.  As ordered by the Panel on March 8, 2023, Cabot Lodge successfully asserted its third-party claims against Werts.

---

[1] All indications appear that the L Bonds do have real value while the issuer is in bankruptcy reorganization.

The 4ASOC repeats the causes of action in the Second Amended Claim against Cabot Lodge for violations of FINRA rules, Regulation Best Interest, Colorado Securities Act, Colorado Revised Statutes, breach of fiduciary duty, breach of contract, negligence and negligent supervision, *respondeat superior* liability and vicarious liability resulting from the alleged acts and omissions of Werts, a former registered representative of Cabot Lodge. However, the 4ASOC fails to set forth any facts or law that meet the *prima facie* threshold of liability as to Cabot Lodge. Werts, as a registered representative of Cabot Lodge, was required to follow established Cabot Lodge procedures including, without limitation, account opening, recommendations, and suitability.  As a regulated broker-dealer, Cabot Lodge has supervisory systems in place to oversee the activities of its registered representatives. The evidence will show that Cabot Lodge acted in good faith with respect to Claimants' accounts and had no knowledge of any alleged improper recommendations by Werts.  The 4ASOC asserts causes of action against Gould alleging that as a control person of Cabot Lodge he is personally responsible for the litany of alleged violations by Cabot Lodge.  Claimants will be unable to hold Gould liable because Claimants will be unable to prove 1) the alleged underlying misconduct by Cabot Lodge which is a necessary requirement for control person liability; 2) Gould failed to act in good faith and 3) Gould directly or indirectly, induced the act or acts constituting the alleged causes of action.

## **GOULD'S ANSWER TO THE 4ASOC**

It is respectfully submitted that the 4ASOC should be denied in its entirety. Since Claimants did not enumerate paragraphs in the 4ASOC, Gould will generally respond to the 4ASOC. To the extent specific allegations are not addressed below, Gould denies such allegations.

Gould denies the material allegations of the 4ASOC as they relate to any implied or actual liability as a control person for the alleged wrongdoing by Cabot Lodge and its former registered

4

representative Werts. Specifically, Gould denies that he is responsible for alleged violations by Cabot Lodge of FSL, FINRA rules, Regulation Best Interest, Colorado Securities Act, breach of fiduciary duty, breach of contract, negligence and negligent supervision, the common law doctrine of *respondeat superior* and vicarious liability. Furthermore, Gould denies liability nor any knowledge of unsuitability on the part of Cabot Lodge.

The instant 4ASOC advances baseless allegations against Cabot Lodge in an attempt to improperly hold it responsible for Claimants' investment in L Bonds.  There is no basis in fact to support the multiple causes of action against Cabot Lodge. Claimants have brought an action against Cabot Lodge, and now name Gould as a control person, in their quest for a deep pocket. An application of the law to the facts of this case will demonstrate that Cabot Lodge acted in accordance with its obligations as a broker-dealer including without limitation, maintained written supervisory procedures reasonably designed to supervise its business and associated persons, conducted a due diligence review of the L Bonds prior to allowing associated persons to offer it to customers and required associated persons who wanted to offer the L Bonds to customers to first complete a training course and verification procedures relating to the features and risks of the L Bonds.

Since Cabot Lodge acted in accordance with its obligations as a broker-dealer, as discussed above, there are no underlying violations, Cabot Lodge maintained a reasonable system of supervision and Gould acted in good faith. Under the applicable standard of law, Gould cannot be held liable as a control person.

A broker-dealer is not an insurer of an investment's success. As set forth herein, the failure of the L Bonds had nothing to do with Cabot Lodge, the risks attendant to investing in the L Bonds were clearly disclosed in the L Bond subscription documents and continuous, periodic SEC filings

made by GWG. Claimants are seeking to back away from an investment that was not profitable and to improperly make Cabot Lodge an insurer of investment success.  As set forth in detail herein, for each of their L Bond investments, each Claimant acknowledged in writing that they reviewed the relevant prospectus, were aware of the risks, accepted the risks. Claimants cannot now claim that because the investment did not make money that the investments were unsuitable and Cabot Lodge, and therefore Gould as a control person, are liable to them for damages.

## I.    <u>GWG</u>

### A.  GWG's Business Evolution

GWG is currently a financial services company with two lines of business: 1) investments in secondary market life insurance assets and 2) "economic interests in independent non-affiliated entities that operate in the alternative asset and epigenetic space".[2] Beginning in or around 2012, GWG commenced an initial offering of the L Bonds to raise capital to fund its business. Thereafter, the L Bonds were offered in three additional offerings: 1) prospectus dated April 12, 2016 (the "2016 Prospectus"); 2) prospectus dated December 1, 2017 (the "2017 Prospectus"); and 3) prospectus dated June 3, 2020 (the "2020 Prospectus") (collectively, the "Prospectuses"). Each of the Prospectuses, and related supplements, contained material disclosure relating to GWG's structure, business evolution, use of proceeds, the automatic renewal provision, subordination of the L Bonds to senior secured debt and multiple risk factors associated with investing in L Bonds.

The 2016 Prospectus described GWG's business as investing in life insurance assets in the secondary marketplace through its subsidiaries with an objective to "earn returns from our

---

[2] *See* Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, Inc., In Support of the Debtors' Chapter 11 Petitions and First Day Motions, April 20, 2022 (Evans' Decl.), ¶ 5. A copy of which is attached hereto as Exhibit "A."

investments in life insurance assets that are greater than the costs necessary to purchase, finance and service those policies to their maturity."[3] To meet this objective, GWG disclosed that its business strategy was "to purchase a large and well-diversified portfolio of life insurance policy assets at discounts to their face value of the policy benefits sufficient enough to generate profitable returns."[4]

GWG disclosed the details of its corporate structure stating that it "conducts its life insurance related business through a wholly-owned subsidiary, GWG Life, LLC (GWG Life), and GWG Life's wholly-owned subsidiaries, GWG Trust (Trust), GWG DLP Funding II, LLC (DLP II) and GWG DLP Funding III, LLC (DLP III)."[5]  In connection with this structure GWG disclosed the implication to L Bond holders.

> "The L Bonds are secured by the assets of GWG Holdings, Inc. and a pledge of all of the common stock by our largest stockholders. Importantly, GWG Holdings' most significant assets are cash and its investment in subsidiaries. Obligations under the L Bonds will be guaranteed by our subsidiary GWG Life, LLC, which guarantee will involve the grant of a security interest in all of the assets of such subsidiary. The majority of our life insurance assets are held in our subsidiaries GWG DLP Funding II, LLC ("DLP II") and GWG DLP Funding III, LLC ("DLP III"), which are [] direct subsidiaries of GWG Life. The life insurance assets held by GWG DLP Funding II will not be collateral for obligations under the L Bonds although the guarantee and collateral provided by GWG Life will include its ownership interest in DLP II and DLP III."[6]

The 2016 Prospectus detailed that GWG engaged Emerson Equity, LLC ("Emerson"), a registered broker-dealer and FINRA member, to act as placement agent for the L Bonds and that

---

[3] *See* the 2016 Prospectus, p. i (https://www.sec.gov/Archives/edgar/data/1456381/000121390016012433/f424b3041316_gwglbonds.htm). Due to the voluminous nature of the SEC filings referenced herein, we are providing links to the electronically available documents on the SEC's website.  Upon request we will provide full digital copies of the referenced filings. We intend to introduce the filings in hard copy and/or full digital form at the hearing.
[4] Id. p. 7.
[5] Id. p. 10.
[6] Id. p. cover.

Emerson could retain other dealers to act as an agent on its behalf in the course of the offering and selling of L Bonds.[7]

The 2016 Prospectus identified that GWG intended to use the net proceeds from the L Bond sales to purchase and finance additional life insurance assets, service and retire other outstanding debt, pay premiums on the life insurance assets, and pay principial amounts owing under previously issued notes or L Bonds.[8]

By 2017 GWG's business evolved to include the use of new products and technology to further the appreciation of the life insurance assets.  In the 2017 Prospectus, GWG described its business as,

> "[A] financial services company committed to finding new ways of transforming the life insurance and related industries through innovative products and services, business processes, financing strategies, and advanced epigenetic technology.  [] More recently, we have focused on applying new epigenetic technology to the global life insurance industry. [] A critical factor for earning positive returns from our life insurance assets is our ability to accurately estimate human life expectancy.  In an effort to improve our accuracy in estimating human life expectancy, we began working with [] Dr. Steve Horvath, a Professor of Human Genetic and Biostatistics at the University of California, Los Angeles (UCLA). In May 2017, our wholly owned subsidiary Life Epigenetics, Inc. exclusively licensed from UCLA Dr. Horvath's "DNA Methylation Based Predictor of Mortality" technology, or "M-Panel" technology, which tests for certain chemical bio-markers occurring at the molecular level []. We believe M-Panel technology could improve our ability to more accurately predict human life expectancy. [] We expect to continue to finance our growth by providing investors with the opportunity to participate in the yield from the life insurance assets we own and growth opportunities we create."[9]

GWG disclosed updated details of its corporate structure noting that it conducted its life insurance related business through a wholly owned subsidiary, GWG Life, LLC (GWG Life), and

---

[7] Id. p. inside cover.
[8] Id. pp. cover, 25-26.
[9] *See* 2017 Prospectus, p. 1-2 (https://www.sec.gov/Archives/edgar/data/1522690/000121390017012881/f424b1120117_gwgholdings.htm).

GWG Life's principal wholly owned subsidiary GWG DLP Funding IV, LLC (DLP IV).[10]  GWG

again disclosed the implications of this structure on the L Bond holders.

> "The L Bonds are secured by the assets of GWG Holdings, Inc. We have
> granted a security interest in all our assets to the indenture trustee for the
> benefit of the L Bond holders.   Our assets consist primarily of our
> investments in our subsidiaries and any cash proceeds we receive from
> life insurance assets of our subsidiaries, and all other cash and investments
> we hold in various accounts.  Substantially all of our life insurance assets
> are held in our subsidiary DLP IV.  The L Bonds' security interest will be
> structurally subordinate to the security interests in favor of our senior
> secured lender, together with any future senior secured lenders of ours.
> The assets of GWG Life, including proceeds it receives as distributions
> from DLP IV and derived from the insurance policies owned by DLP IV,
> are collateral for GWG Life's guarantee of the repayment of principal and
> interest on the L Bonds."[11]

The 2017 Prospectus again identified Emerson as the dealer manager for the L Bond

offering and that it would enter into participating dealer agreements with other broker-dealers to

sell the L Bonds.[12] GWG had a network of approximately 145 member firms and registered

investment advisors involved in the sale of the L Bonds.[13]

The 2017 Prospectus identified that GWG intended to use the majority of the net proceeds

from the L Bond sales to purchase and service life insurance policy assets, pay fees, interests and

principal to our lenders, including under our senior credit facility, previously issued L Bonds and

working capital.[14]

In 2018 and 2019 GWG engaged in a series of transactions with The Beneficient Group,

LP ("Beneficient"), which resulted in Beneficient becoming a consolidated subsidiary of GWG.

GWG disclosed these transactions in its Forms 8-K filings with the SEC.[15]

---

[10] 2017 Prospectus, p. 3.
[11] 2017 Prospectus, p. 7.
[12] 2017 Prospectus, inside cover.
[13] Exhibit "A", ¶ 18.
[14] 2017 Prospectus, pp. 8; 21.
[15] *See* Form 8-K dated January 12, 2018 and August 10, 2018.
(https://www.sec.gov/Archives/edgar/data/1522690/000121390018000632/f8k011218_gwgholding.htm;

As the business of GWG continued to evolve, the 2020 Prospectus described the new business path of GWG and highlighted the significant change in GWG's business.

> "In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient [] that has resulted in a **significant reorientation of our business and capital allocation strategy** towards an expansive and diverse exposure to alternative assets." (Emphasis added.)[16]

> []

> "Beneficient, through its subsidiaries, plans to operate three potentially high value, high margin lines of business: (i) private trust lending and liquidity products; (ii) trust and custody services; and (iii) financial technology. **While we are continuing our work to maximize the value of our secondary life insurance business, we do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward providing liquidity to a broader range of alternative assets [] through Beneficient.** [] [W]e continue to explore various strategic alternatives for our life insurance portfolio aimed at maximizing its value, including a possible sale, refinancing or recapitalization of our life insurance portfolio." (Emphasis added.)[17]

GWG disclosed the restructuring of its business advising that GWG conducts its life insurance secondary market business through a wholly owned subsidiary, GWG Life and GWG Life's wholly owned subsidiaries, Life Trust and DLP IV; GWG has indirect interests and loans collateralized by cash flows from other alterative assets held by Beneficient; a November 11, 2019 transaction relating to its epigenetic technology wherein it contributed common stock of Life Epigenetics and membership interests in youSurance to a legal entity, InsurTech Holdings, LLC,

---

which changed its name on March 2, 2020 to FOXO BioScience LLC, and for which it maintains an equity investment; and GWG obtained control over Beneficient.[18]

The 2020 Prospectus again disclosed the implications of the corporate structure as well as those relating to its changed business focus on the L Bond holders.

> "Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours. The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds."[19]

The 2020 Prospectus identified that GWG intended to use the net proceeds from the L Bond sales to grow its alternative asset exposure through equity investments or loans in Beneficient and to meet other obligations, including debt obligations. GWG disclosed that Beneficient would have "broad discretion" to use proceeds of any investment and may use them to fund alternative asset financing, repay indebtedness and to pay interest and principal amounts owing under previously issued L Bonds.[20]

In or around April 2021, GWG voluntarily suspended sales of the L Bonds as a result of two accounting questions submitted to the SEC. The final response from the SEC occurred on July

---

[18] 2020 Prospectus, p. 2.
[19] 2020 Prospectus, pp.7-8.
[20] 2020 Prospectus, pp. 9; 14.

26, 2021, which caused GWG to file its 2020 Form 10-K and relevant 2021 Form 10-Qs late. During the suspension, GWG did not have access to the capital its business plan relied upon from the sales of the L Bonds. Once it brought its filings up to date, GWG began reselling the L Bonds in December 2021.[21]  L Bond sales from December 2021 to January 10, 2022 were significantly lower as a result of the SEC issuing subpoenas to selling group members who thereafter, decided to cease offering the L Bonds.  As a result, GWG did not raise sufficient new capital that it needed to fund its business, which caused GWG's default on all interest and principal payments due January 15, 2022 and thereafter.[22]

Beginning in August 2021, Beneficient and GWG engaged in a series of transactions to ultimately separate Beneficient from GWG. This transaction was effective as of November 29, 2021.[23]

On April 20, 2022, GWG and certain of its affiliates, filed for Chapter 11 Bankruptcy to "preserve and maximize the value of their chapter 11 estates."[24] GWG believes it has "valuable, although presently illiquid, assets that, given time, should yield substantial recoveries for the Debtors and their stakeholders."[25] The bankruptcy is ongoing under the administration of the US Bankruptcy Court for the Southern District of Texas.

  B. **The Risk Disclosures in the Prospectuses Warned Investors of the Risks of Investing in the L Bonds**.

The Prospectuses contained meaningful risk disclosures, which were updated as GWG's business evolved, warning investors that investing in L Bonds contained certain risks relating to GWG's industry, business and structure.

---

[21] Exhibit "A", ¶¶ 45-46.
[22] Exhibit "A", ¶¶ 46-47.
[23] Exhibit "A", ¶ 23.
[24] Exhibit "A", ¶ 3.
[25] Exhibit "A", ¶ 5.

Each Prospectus advised investors to read the prospectus in order to determine if an investment in L Bonds was appropriate. The Prospectuses disclosed that "the L bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk Factors section of this prospectus."[26] Moreover, in the "Questions and Answers" section of the Prospectuses, the following was asked and answered:

> **Are there any risks involved in investing in this offering?**
> Yes.  Investing in L Bonds involves a high degree of risk. You should carefully review the "Risk Factors" section of this prospectus, which contain a detailed discussion of the material risks that you should consider before investing in our L Bonds.[27]

As set forth in Section A herein, each of the Prospectuses cautioned that GWG's assets were cash and its investment in its subsidiaries.  Each of the Prospectuses made clear that the majority of life insurance assets were held in subsidiaries but that the life insurance assets held in the subsidiaries would not be collateral for obligations of the L Bonds.  The Prospectuses further warned that such facts present the risk to investors that the collateral security may be insufficient to repay the L Bonds upon an event of default.

### i.   L Bond Priority is Structurally Junior and Subordinated to other Senior Debt or Obligations

The Prospectuses contained clear disclosures that the L Bonds were not a priority security interest and were structurally junior to other obligations.

The L Bonds will constitute secured debt of GWG Holdings. The payment of principal and interest on the L Bonds will be:

- pari passu with respect to payment on and collateral securing the approximately $24.0 million in outstanding principal amount of Series I Secured Notes previously issued by our subsidiary GWG Life, and the

---

[26] 2016 Prospectus, p. 3, 16, 63.; 2017 Prospectus, p. iv, 3, 9, 68; 2020 Prospectus, p. iv, 9, 33.
[27] 2016 Prospectus, p. 7; 2017 Prospectus, p. viii; 2020 Prospectus, p. viii.

previously issued L Bonds [];

- structurally junior to the present and future obligations owed by our subsidiaries [] under our current senior revolving credit facility [], and structurally or contractually junior to any future obligations that [the subsidiaries] or other primary obligors or guarantors may have under future senior secured borrowing facilities; and

- structurally junior to the present and future claims of other creditors of [the subsidiaries], including trade creditors.

[]

An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of [the subsidiaries], any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity.** (Emphasis in the original.)

[]

**In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default.** (Emphasis in the original.)[28]
[]

An investment in the L bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain senior borrowing arrangements that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lenders. [] In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows. [] These provisions will restrict cash flows available for payment of principal and interest on the L Bonds.[29]

### ii. Risk of Inability to Raise Capital

The Prospectus warned that GWG relies on the sale of L Bonds as a principal means to raise funds needed to meet the company's stated goals.[30] As described in Section A, this

---

[28] 2016 Prospectus, pp. 14-15; 46; 53-54; 2017 Prospectus, pp. 7; 57-60; 2020 Prospectus, pp. 7-8; 12-13; 22-24. We note, the principal amounts are different in the 2017 and 2020 Prospectuses.
[29] 2016 Prospectus, p. 9, 17; 2017 Prospectus, pp. 9, 12-14; 2020 Prospectus, p. 9.
[30] 2016 Prospectus, p. 19; 2017 Prospectus, p. 12.

Risk Factor became a reality as a result of the lower sales of L Bonds, and ultimately the inability to sell L Bonds.

### iii. No Market or Anticipated Listing of L Bonds

The Prospectuses warned there was no existing market for the L Bonds and it is not anticipated there will be a secondary market.  There cannot be any assurance as to the liquidity of any market that may develop for the L Bonds, or the ability to sell them or the price at which they may be able to be sold.[31]

### iv. Automatic Renewal of L Bonds

The Prospectuses advised investors that upon maturity, the L Bonds will automatically renew unless repaid at the investor's election. GWG disclosed that it would notify the investor at least 30 days prior to the maturity date and remind the investor the L Bond will automatically renew unless the investor exercises the option at least 15 days prior to maturity date to have the L Bond repaid.  GWG advised that it would provide the investor a then-current form of prospectus and any supplements.[32]

## II. Claimants Knowingly Accepted the Risks of Investing in the L Bonds

### A. Michael L. Roluti and Lori C. Roluti

Claimants Michael L. Roluti and Lori C. Roluti (the "Roluti Claimants") have known Werts since 2015.[33] On or about January 24, 2019, the Roluti Claimants jointly completed a series of documents for their investment in L Bonds (the "2019 Roluti Investment"), which included: 1) a CLS Client Profile Form, which included the Roluti Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the

---

[31] 2016 Prospectus, pp. 16; 24; 2017 Prospectus, p. 8; 18; 2020 Prospectus, pp. 9; 11.
[32] 2016 Prospectus, pp. 14; 51; 2017 Prospectus, p. 6; 55; 2020 Prospectus, p.  6; 20
[33] *See* Exhibit "B-3", pp. 2-3; Exhibit "B-3", pp. 2-3; Exhibit "B-6", pp. 2-3.

prospectus/offering documents (the "2019 Roluti Profile Form");[34] 2) a CLS GWG L Bond Risk Acknowledgement Form wherein the Roluti Claimants made certain acknowledgements concerning the L Bonds (the "2019 Roluti Risk Form");[35] and 3) a GWG Subscription Agreement which contained the Roluti Claimants' acknowledgement of general suitability standards (the "2019 Roluti Subscription Agreement").[36] On or about January 13, 2021, the Roluti Claimants made another investment into the L Bonds (the "January 2021 Roluti Investment"). Again, the Roluti Claimants completed a series of documents relating to the January 2021 Roluti Investment, which included: 1) a CLS Client Profile Form, which included the Roluti Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "January 2021 Roluti Profile Form");[37] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Roluti Claimants again made certain acknowledgements concerning the L Bonds (the "January 2021 Roluti Risk Form");[38] and 3) a GWG L Bond Change of Investment Form (the "January 2021 L Bond Change Form").[39] A little under a month later, on or about February 11, 2021, the Roluti Claimants made a third investment into the L Bonds (the "February 2021 Roluti Investment"). Again, the Roluti Claimants completed a series of documents relating to the February 2021 Roluti Investment, which included: 1) a CLS Client Profile Form, which included the Roluti Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "February 2021 Roluti Profile Form");[40] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Roluti Claimants again made certain

---

[34] *See* Exhibit "B".
[35] *See* Exhibit "B-1".
[36] *See* Exhibit "B-2".
[37] *See* Exhibit "B-3".
[38] *See* Exhibit "B-4".
[39] *See* Exhibit "B-5".
[40] *See* Exhibit "B-6".

acknowledgements concerning the L Bonds (the "February 2021 Roluti Risk Form");[41] and 3) a GWG Subscription Agreement which again contained the Roluti Claimants' acknowledgement of general suitability standards (the "February 2021 Roluti Subscription Agreement").[42]

In the 2019 Roluti Profile Form, the January 2021 Roluti Profile Form, and the February 2021 Roluti Profile Form, the Roluti Claimants signed their acknowledgements of the following relating to the 2019 Roluti Investment, the January 2021 Roluti Investment, and the February 2021 Roluti Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[43]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[44]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[45]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[46]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[47]

---

[41] *See* Exhibit "B-7".
[42] *See* Exhibit "B-8".
[43] *See* Exhibit "B", p. 7; Exhibit "B-3", p. 7; Exhibit "B-6", p. 7.
[44] Id.
[45] Id.
[46] Id.
[47] Id.

In the 2019 Roluti Risk Form, the Roluti Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[48]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

  []

  Ranking in the Event of Default:
  The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary (which holds the life insurance collateral).

  []

  Collateral:

  The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.  The majority of their life

---

[48] *See* Exhibit "B-1".

insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

<u>Risk to Your Income:</u>
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

<u>Renewal:</u>
Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

In the 2019 Roluti Risk Form, the January 2021 Roluti Risk Form, and the February 2021 Roluti Risk Form, the Roluti Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[49]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2019 Roluti Subscription Agreement, the Roluti Claimants signed their acknowledgments that all "reports notices and information will be sent to the email address

---

[49] *See* Exhibit "B-1"; Exhibit "B-4"; Exhibit "B-7".

indicated: lroluti@q.com". In the February 2021 Roluti Subscription Agreement, the Roluti Claimants signed their acknowledgements that all "report notices and information will be sent to the email address indicated: mroluti@q.com". Each Subscription Agreement[50] contained the Roluti Claimants' acknowledgement of the following under the penalties of perjury[51]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

In the January 2021 L Bond Change Form, the Roluti Claimants added $25,000 to their L Bond Investment.[52]

Based on the foregoing, the Roluti Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Roluti Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investments.

### B. Alann R. App and Mare P. App

Claimants Alann R. App and Mare P. App (the "App Claimants") have known Werts since 2014.[53] On or about July 24, 2018, the App Claimants jointly completed a series of documents for their investment in L Bonds (the "2018 App Investment") which included: 1) a CLS Client Profile Form, which included the App Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2018 App Profile Form");[54] 2) CLS GWG L Bond Risk Acknowledgement Form

---

[50] *See* Exhibit "B-2"; Exhibit "B-8".
[51] Id.
[52] *See* Exhibit "B-5".
[53] *See* Exhibit "C", pp. 2-3.
[54] *See* Exhibit "C".

wherein the App Claimants made certain acknowledgements concerning the L Bonds (the "2018 App Risk Form");[55] 3) GWG Subscription Agreement which contained Claimant Beach's acknowledgement of general suitability standards (the "2018 App Subscription Agreement").[56]

In the 2018 App Profile Form, the App Claimants signed their acknowledgement of the following relating to the 2018 App Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[57]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[58]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[59]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[60]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[61]

---

[55] *See* Exhibit "C-1".
[56] *See* Exhibit "C-2".
[57] *See* Exhibit "C", p. 7.
[58] Id.
[59] Id.
[60] Id.
[61] Id.

The App Claimants also completed a risk form when they invested in the L Bonds. In the 2018 App Risk Form, the App Claimants signed their acknowledgment, with their respective initials next to each statement, including, without limitation, the following[62]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026. To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

  []

  Ranking in the Event of Default:
  The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary (which holds the life insurance collateral).

  []

  Collateral:

---

[62] *See* Exhibit "C-1".

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>  The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

<u>Risk to Your Income:</u>
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

<u>Renewal:</u>
Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 App Subscription Agreement, the App Claimants signed their acknowledgment that all "reports notices and information will be sent to the email address

indicated: aapp55@yahoo.com". The 2018 App Subscription Agreement[63] contained the App Claimants' acknowledgement of the following under the penalties of perjury[64]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, the App Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The App Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investment.

### C.  Sandra J. Aschert

Claimant Sandra J. Aschert ("Claimant Aschert") has known Werts since 2007.[65] On or about August 17, 2018, Claimant Aschert completed a series of documents for her investment in L Bonds (the "2018 Aschert Investment") which included: 1) a CLS Client Profile Form, which included Claimant Aschert's acknowledgement of certain representations relating to the investment, her income, net worth and receipt and review of the prospectus/offering documents (the "2018 Aschert Profile Form");[66] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Aschert made certain acknowledgements concerning the L Bonds (the "2018 Aschert Risk Form");[67] 3) GWG Subscription Agreement which contained Claimant Aschert's acknowledgement of general suitability standards (the "2018 Aschert Subscription Agreement").[68]

---

[63] *See* Exhibit "C-2".
[64] Id.
[65] *See* Exhibit "D", pp. 2-3.
[66] *See* Exhibit "D".
[67] *See* Exhibit "D-1".
[68] *See* Exhibit "D-2".

Claimant Aschert completed a client profile form when she invested in the L Bonds. In the 2018 Aschert Profile Form, Claimant Aschert signed her acknowledgement of the following relating to the 2018 Aschert Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[69]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[70]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[71]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[72]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[73]

In the 2018 Aschert Risk Form, Claimant Aschert signed her acknowledgment, with her respective initials next to each statement, including, without limitation, the following[74]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

---

[69] *See* Exhibit "D", p. 7.
[70] Id.
[71] Id.
[72] Id.
[73] Id.
[74] *See* Exhibit "D-1".

- I/we understand after <u>reading and understanding the prospectus</u> that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after <u>reading and understanding the prospectus</u> here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  <u>Credit Facility:</u>
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  <u>To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].</u>

  []

  <u>Ranking in the Event of Default:</u>
  The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. <u>The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary</u> (which holds the life insurance collateral).

  []

  <u>Collateral:</u>

  The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>  The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

  <u>Risk to Your Income:</u>
  We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

  <u>Renewal:</u>

>Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 Aschert Subscription Agreement, Claimant Aschert signed her acknowledgment that all "reports notices and information will be sent to the email address indicated: sjaschert@gmail.com". The 2018 Aschert Subscription Agreement[75] Claimant Aschert's acknowledgement of the following under the penalties of perjury[76]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, Claimant Aschert was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the

---

[75] *See* Exhibit "D-2".
[76] Id.

L Bonds. Claimant Aschert acknowledged receipt, review and understanding of the materials and risks, and proceeded with her investment.

### D.  William H. Batschelet

Claimant William H. Batschelet ("Claimant Batschelet") has known Werts since 2013.[77] On or about October 5, 2018, Claimant Batschelet individually completed a series of documents for his investment in L Bonds (the "2018 Batschelet Investment") which included: 1) a CLS Client Profile Form, which included Claimant Batschelet's acknowledgement of certain representations relating to the investment, his income, net worth and receipt and review of the prospectus/offering documents (the "2018 Batschelet Profile Form");[78] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Batschelet made certain acknowledgements concerning the L Bonds (the "2018 Batschelet Risk Form");[79] 3) GWG Subscription Agreement which contained Claimant Batschelet's acknowledgement of general suitability standards (the "2018 Batschelet Subscription Agreement").[80]

In the 2018 Batschelet Profile Form, Claimant Batschelet signed his acknowledgement of the following relating to the 2018 Batschelet Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[81]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[82]

---

[77] *See* Exhibit "E", p. 2.
[78] *See* Exhibit "E".
[79] *See* Exhibit "E-1".
[80] *See* Exhibit "E-2".
[81] *See* Exhibit "E", p.7.
[82] Id.

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[83]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[84]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[85]

In the 2018 Batschelet Risk Form, Claimant Batschelet signed his acknowledgment, with his respective initials next to each statement, including, without limitation, the following[86]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026. To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

  []

---

[83] Id.
[84] Id.
[85] Id.
[86] *See* Exhibit "E-1".

<u>Ranking in the Event of Default:</u>
The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. <u>The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary</u> (which holds the life insurance collateral).


[]

<u>Collateral:</u>

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>   The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

<u>Risk to Your Income:</u>
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

<u>Renewal:</u>
Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 Batschelet Subscription Agreement, Claimant Batschelet signed his acknowledgment that all "reports notices and information will be sent to the email address indicated: wbatsche@aol.com". The 2018 Batschelet Subscription Agreement[87] contained Claimant Batschelet's acknowledgement of the following under the penalties of perjury[88]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, Claimant Batschelet was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Batschelet acknowledged receipt, review and understanding of the materials and risks, and proceeded with his investment.

### E.  Jodi G. Duncan and Sheldon O. Duncan

Claimants Jodi G. Duncan and Sheldon O. Duncan (the "Duncan Claimants"), on or about January 3, 2019, jointly completed a series of documents for their investment in L Bonds (the "2019 Duncan Investment") which included: 1) a CLS Client Profile Form, which included the Duncan Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2019 Duncan Profile Form");[89] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Duncan Claimants made certain acknowledgements concerning the L Bonds (the "2019 Duncan Risk

---

[87] *See* Exhibit "E-2".
[88] Id.
[89] *See* Exhibit "F".

Form");[90] 3) GWG Subscription Agreement which contained the Duncan Claimants' acknowledgement of general suitability standards (the "2019 Duncan Subscription Agreement").[91] On or about January 5, 2021, the Duncan Claimants made another investment into the L Bonds (the "2021 Duncan Investment"). The Duncan Claimants again jointly completed a series of documents for their investment, which include: 1) a CLS Client Profile Form, which included the Duncan Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2021 Duncan Profile Form");[92] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Duncan Claimants made certain acknowledgements concerning the L Bonds (the "2021 Duncan Risk Form");[93] 3) GWG L Bond Change of Investment Form (the "2021 Duncan L Bond Change Form").[94]

In the 2019 Duncan Profile Form and the 2021 Duncan Profile Form, the Duncan Claimants signed their acknowledgement of the following relating to the 2019 Duncan Investment and the 2021 Duncan Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[95]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[96]

For Limited *Partnerships/ Private Placements*

---

[90] *See* Exhibit "F-1".
[91] *See* Exhibit "F-2".
[92] *See* Exhibit "F-3".
[93] *See* Exhibit "F-4".
[94] *See* Exhibit "F-5".
[95] *See* Exhibit "F", p. 7; Exhibit "F-3", p.7
[96] Id.

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[97]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[98]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[99]

In the 2019 Duncan Risk Form, the Duncan Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[100]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026. To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

  []

  Ranking in the Event of Default:

---

[97] Id.
[98] Id.
[99] Id.
[100] *See* Exhibit "F-1".

The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. <u>The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary</u> (which holds the life insurance collateral).

[]

<u>Collateral:</u>

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>   The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

<u>Risk to Your Income:</u>
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

<u>Renewal:</u>

Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

In the 2019 Duncan Risk Form and the 2021 Duncan Risk Form, the Duncan Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[101]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

---

[101] *See* Exhibit "F-1"; Exhibit "F-4".

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2019 Duncan Subscription Agreement, the Duncan Claimants signed their acknowledgments that all "reports notices and information will be sent to the email address indicated: sheldonjodi@hotmail.com". The 2019 Duncan Subscription Agreement[102] contained the Duncan Claimants' acknowledgement of the following under the penalties of perjury[103]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

In the 2021 Duncan L Bond Change Form, the Duncan Claimants added $15,000 to their L Bond Investment.[104]

Based on the foregoing, the Duncan Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Duncan Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investments.

### F.  Lynn E. Skinner Elliott and John G. Elliott

---

[102] *See* Exhibit "F-2"; Exhibit "F-5".
[103] Id.
[104] *See* Exhibit "F-5".

Claimants Lynn E. Skinner Elliot and John G. Elliott (the "Elliott Claimants") have known Werts since 2011.[105] On or about May 8, 2018, the Elliott Claimants jointly completed a series of documents for their investment in L Bonds (the "2018 Elliott Investment") which included: 1) a CLS Client Profile Form, which included the Elliott Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2018 Elliott Profile Form");[106] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Elliott Claimants made certain acknowledgements concerning the L Bonds (the "2018 Elliott Risk Form");[107] 3) GWG Subscription Agreement which contained the Elliott Claimants' acknowledgement of general suitability standards (the "2018 Elliott Subscription Agreement").[108]

In the 2018 Elliott Profile Form, the Elliott Claimants signed their acknowledgement of the following relating to the 2018 Elliott Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[109]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[110]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[111]

---

[105] *See* Exhibit "G", p. 2-3.
[106] *See* Exhibit "G".
[107] *See* Exhibit "G-1".
[108] *See* Exhibit "G-2".
[109] *See* Exhibit "G", p.7.
[110] Id.
[111] Id.

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[112]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[113]

In the 2018 Elliott Risk Form, the Elliott Claimants signed their acknowledgment, with their respective initials next to each statement, including, without limitation, the following[114]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

   Credit Facility:
   The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

   []

   Ranking in the Event of Default:
   The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary (which holds the life insurance collateral).

---

[112] Id.
[113] Id.
[114] See Exhibit "G-1".

[]

Collateral:

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>  The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

Risk to Your Income:
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

Renewal:
Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 Elliott Subscription Agreement, the Elliott Claimants signed their

acknowledgments that all "reports notices and information will be sent to the email address

indicated: john7elliott@comcast.net & vocalynn@comcast.net". The 2018 Elliott Subscription Agreement[115] contained the Elliott Claimants' acknowledgements of the following under the penalties of perjury[116]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, the Elliott Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Elliott Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investment.

### G.  Rhonda S. Miracle

Claimant Rhonda S. Miracle ("Claimant Miracle"), on or about January 4, 2019, individually completed a series of documents for her investment in L Bonds (the "2019 Miracle Investment") which included: 1) a CLS Client Profile Form, which included Claimant Miracle's acknowledgement of certain representations relating to the investment, her income, net worth and receipt of the prospectus/offering documents (the "2019 Miracle Profile Form");[117] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Miracle made certain acknowledgements concerning the L Bonds (the "2019 Miracle Risk Form");[118] 3) GWG Subscription Agreement which contained Claimant Miracle's acknowledgement of general suitability standards (the "2019 Miracle Subscription Agreement").[119]

---

[115] *See* Exhibit "G-2.
[116] Id.
[117] *See* Exhibit "H".
[118] *See* Exhibit "H-1".
[119] *See* Exhibit "H-2".

In the 2019 Miracle Profile Form, Claimant Miracle signed her acknowledgement of the following relating to the 2019 Miracle Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[120]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[121]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[122]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[123]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[124]

In the 2019 Miracle Risk Form, Claimant Miracle signed her acknowledgment, with her respective initials next to each statement, including, without limitation, the following[125]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

---

[120] *See* Exhibit "H", p. 7.
[121] Id.
[122] Id.
[123] Id.
[124] Id.
[125] *See* Exhibit "H-1".

- I/we understand after <u>reading and understanding the prospectus</u> that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after <u>reading and understanding the prospectus</u> here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  <u>Credit Facility:</u>
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  <u>To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].</u>

  []

  <u>Ranking in the Event of Default:</u>
  The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. <u>The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary</u> (which holds the life insurance collateral).

  []

  <u>Collateral:</u>

  The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. <u>The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.</u>  The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

  <u>Risk to Your Income:</u>
  We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or <u>adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds,</u> and to continue to operate our business.

  <u>Renewal:</u>
  Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid <u>they will automatically renew.</u>

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2019 Miracle Subscription Agreement, Claimant Miracle signed her acknowledgment that all "reports notices and information will be sent to the email address indicated: rsrm101@hotmail.com". The 2019 Miracle Subscription Agreement[126] contained Claimant Miracle's acknowledgement of the following under the penalties of perjury[127]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, Claimant Miracle was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Miracle acknowledged receipt, review and understanding of the materials and risks, and proceeded with her investment.

### H.  John Moody and Suzanne Moody

---

[126] *See* Exhibit "H-2".
[127] Id.

Claimants John Moody and Suzanne Moody (the "Moody Claimants") have known Werts since 2015.[128] On or about July 23, 2018, the Moody Claimants jointly completed a series of documents for their investment in L Bonds (the "2018 Moody Investment") which included: 1) a CLS Client Profile Form, which included the Moody Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2018 Moody Profile Form");[129] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Moody Claimants made certain acknowledgements concerning the L Bonds (the "2018 Moody Risk Form");[130] 3) GWG Subscription Agreement which contained the Moody Claimants' acknowledgement of general suitability standards (the "2018 Moody Subscription Agreement").[131]

In the 2018 Moody Profile Form, the Moody Claimants signed their acknowledgements of the following relating to the 2018 Moody Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[132]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[133]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[134]

---

[128] *See* Exhibit "I", pp. 2-3.
[129] *See* Exhibit "I".
[130] *See* Exhibit "I-1".
[131] *See* Exhibit "I-2".
[132] *See* Exhibit "I", p. 7.
[133] Id.
[134] Id.

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[135]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[136]

In the 2018 Moody Risk Form, the Moody Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[137]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  To learn more about the credit facility we recommend that you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

  []

  Ranking in the Event of Default:
  The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary (which holds the life insurance collateral).

---

[135] Id.
[136] Id.
[137] *See* Exhibit "I-1".

[]

Collateral:

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies. The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust. The L Bonds interest is structurally junior to the senior secured lender.

Risk to Your Income:

We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds, and to continue to operate our business.

Renewal:

Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid they will automatically renew.

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 Moody Subscription Agreement, the Moody Claimants signed their acknowledgments that all "reports notices and information will be sent to the email address indicated: sfm3365@msn.com". The 2018 Moody Subscription Agreement[138] contained the Moody Claimants' acknowledgement of the following under the penalties of perjury[139]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, the Moody Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Moody Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investment.

## I.   Dan Rolince and Christine Rolince

Claimants Dan Rolince and Christine Rolince (the "Rolince Claimants") have known Werts since 2015.[140] On or about August 11, 2020, the Rolince Claimants jointly completed a series of documents for their investment in L Bonds (the "2020 Rolince Investment") which included: 1) a CLS Client Profile Form, which included the Rolince Claimants' acknowledgements of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2020 Rolince Profile Form");[141] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Rolince Claimants made certain acknowledgements concerning the L Bonds (the "2020 Rolince Risk Form");[142] 3) GWG Subscription Agreement which contained the Rolince Claimants' acknowledgements of general suitability standards (the

---

[138] *See* Exhibit "I-2".
[139] Id.
[140] *See* Exhibit "J", pp. 2-3.
[141] *See* Exhibit "J".
[142] *See* Exhibit "J-1".

"2020 Rolince Subscription Agreement").[143] In less than a month later, on or about August 25, 2020, Dan Rolince individually completed another series of documents for his investment in L Bonds (the "2020 Dan Rolince Investment") which included 1) a CLS Client Profile Form, which included Dan Rolince's acknowledgements of certain representations relating to the investment, his income, net worth and receipt and review of the prospectus/offering documents (the "2020 Dan Rolince Profile Form");[144] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Dan Rolince made certain acknowledgements concerning the L Bonds (the "2020 Dan Rolince Risk Form");[145] 3) GWG Subscription Agreement, which again contained his acknowledgement of general suitability standards (the "2020 Dan Rolince Subscription Agreement").[146]

In the 2020 Rolince Profile Form and the 2020 Dan Rolince Profile Form, the Rolince Claimants signed their acknowledgements of the following relating to the 2020 Rolince Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[147]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[148]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[149]

---

[143] *See* Exhibit "J-2".
[144] *See* Exhibit "J-3".
[145] *See* Exhibit "J-4".
[146] *See* Exhibit "J-5".
[147] *See* Exhibit "J", p. 7; Exhibit "J-3", p. 7.
[148] Id.
[149] Id.

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[150]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[151]

In the 2020 Rolince Risk Form and the 2020 Dan Rolince Risk Form, the Rolince Claimants signed their acknowledgments, with their respective initials next to each statement, including, without limitation, the following[152]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2020 Rolince Subscription Agreement and the 2020 Dan Rolince Subscription Agreement, the Rolince Claimants signed their acknowledgments, jointly and individually, that all "reports notices and information will be sent to the email address indicated: djrolince@mac.com". The 2020 Rolince Subscription Agreement and the 2020 Dan Rolince

---

[150] Id.
[151] Id.
[152] *See* Exhibit "J-1"; Exhibit "J-4".

Subscription Agreement[153] both contained the Rolince Claimants' acknowledgements of the following under the penalties of perjury[154]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, the Rolince Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Rolince Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investments.

### J.   Timothy Redmond

Claimant Timothy Redmond ("Claimant Redmond") has known Werts since 2013.[155] On or about September 1, 2020, Claimant Redmond individually completed a series of documents for his investment in L Bonds (the "2020 Redmond Investment") which included: 1) a CLS Client Profile Form, which included Claimant Redmond's acknowledgement of certain representations relating to the investment, his income, net worth and receipt and review of the prospectus/offering documents (the "2020 Redmond Profile Form");[156] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Redmond made certain acknowledgements concerning the L Bonds (the "2020 Redmond Risk Form");[157] 3) GWG Subscription Agreement which contained Claimant Redmond's acknowledgement of general suitability standards (the "2020 Redmond Subscription Agreement").[158]

---

[153] *See* Exhibit "J-2"; Exhibit "J-5".
[154] Id.
[155] *See* Exhibit "K", p. 2.
[156] *See* Exhibit "K".
[157] *See* Exhibit "K-1".
[158] *See* Exhibit "K-2".

In the 2020 Redmond Profile Form, Claimant Redmond signed his acknowledgement of the following relating to the 2020 Redmond Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[159]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[160]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[161]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[162]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[163]

In the 2020 Redmond Risk Form, Claimant Redmond signed his acknowledgment, with his respective initials next to each statement, including, without limitation, the following[164]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

---

[159] *See* Exhibit "K", p. 7.
[160] Id.
[161] Id.
[162] Id.
[163] Id.
[164] *See* Exhibit "K-1".

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2020 Redmond Subscription Agreement, Claimant Redmond signed his acknowledgment that all "reports notices and information will be sent to the email address indicated:  dlsanel37@gmail.com". The 2020 Redmond Subscription Agreement[165] contained Claimant Redmond's acknowledgement of the following under the penalties of perjury[166]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, Claimant Redmond was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Redmond acknowledged receipt, review and understanding of the materials and risks, and proceeded with his investment.

### K.  Diane L. Sanelli

Claimant Diane L. Sanelli ("Claimant Sanelli") has known Werts since 2013.[167], on or about September 1, 2020, Claimant Sanelli individually completed a series of documents for her investment in L Bonds (the "2020 Sanelli Investment") which included: 1) a CLS Client Profile

---

[165] *See* Exhibit "K-2".
[166] Id.
[167] *See* Exhibit "L", p. 2.

Form, which included Claimant Sanelli's acknowledgement of certain representations relating to the investment, her income, net worth and receipt and review of the prospectus/offering documents (the "2020 Sanelli Profile Form");[168] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Sanelli made certain acknowledgements concerning the L Bonds (the "2020 Sanelli Risk Form");[169] 3) an Alternative Investment Client Acknowledgement and Agreement (the "2020 Sanelli Alt Agreement");[170] 4) GWG Subscription Agreement which contained Claimant Sanelli's acknowledgement of general suitability standards (the "2020 Sanelli Subscription Agreement").[171]

In the 2020 Sanelli Profile Form, Claimant Sanelli signed her acknowledgement of the following relating to the 2020 Sanelli Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[172]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[173]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[174]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[175]

---

[168] *See* Exhibit "L".
[169] *See* Exhibit "L-1".
[170] *See* Exhibit "L-2".
[171] *See* Exhibit "L-3".
[172] *See* Exhibit "L", p. 7.
[173] Id.
[174] Id.
[175] Id.

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[176]

In the 2020 Sanelli Risk Form, Claimant Sanelli signed her acknowledgment, with her respective initials next to each statement, including, without limitation, the following[177]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2020 Sanelli Subscription Agreement, Claimant Sanelli signed her acknowledgment that all "reports notices and information will be sent to the email address indicated: dlsanel37@gmail.com". The 2020 Sanelli Subscription Agreement[178] contained Claimant Sanelli's acknowledgement of the following under the penalties of perjury[179]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

---

[176] Id.
[177] *See* Exhibit "L-1".
[178] *See* Exhibit "L-2".
[179] Id.

Based on the foregoing, Claimant Sanelli was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Sanelli acknowledged receipt, review and understanding of the materials and risks, and proceeded with her investment.

### L.  Lynn Alvin Sherretz

Claimant Lynn Alvin Sherretz ("Claimant Sherretz") has known Werts since 2014.[180] On or about September 13, 2018, Claimant Sherretz individually completed a series of documents for her investment in L Bonds (the "2018 Sherretz Investment") which included: 1) a CLS Client Profile Form, which included Claimant Sherretz's acknowledgement of certain representations relating to the investment, her income, net worth and receipt and review of the prospectus/offering documents (the "2018 Sherretz Profile Form");[181] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Sherretz made certain acknowledgements concerning the L Bonds (the "2018 Sherretz Risk Form");[182] 3) GWG Subscription Agreement which contained Claimant Sherretz's acknowledgement of general suitability standards (the "2018 Sherretz Subscription Agreement").[183]

In the 2018 Sherretz Profile Form, Claimant Sherretz signed her acknowledgement of the following relating to the 2018 Sherretz Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[184]

---

[180] *See* Exhibit "M", p. 2.
[181] *See* Exhibit "M".
[182] *See* Exhibit "M-1".
[183] *See* Exhibit "M-2".
[184] *See* Exhibit "M", p. 7.

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[185]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[186]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[187]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[188]

In the 2018 Sherretz Risk Form, Claimant Sherretz signed her acknowledgment, with her respective initials next to each statement, including, without limitation, the following[189]:

- I/we have received and carefully read GWG's prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our net worth.

- I/we understand after reading and understanding the prospectus that an investment in GWG L Bonds involve significant risks and are speculative in nature.

- I/we understand after reading and understanding the prospectus here is a summary of some of the disclosures made in the prospectus and other regulatory filings:

  Credit Facility:
  The Company through its indirect subsidiary GWG DLP Funding entered into a new credit facility which matures on September 14, 2026.  To learn more about the credit facility we recommend that

---

[185] Id.
[186] Id.
[187] Id.
[188] Id.
[189] *See* Exhibit "M-1".

you review the Company's 8K dated September 14, 2016 [link provided but omitted here].

[]

Ranking in the Event of Default:
The payment of principal and interest will be pari passu with respect to payment on and collateral securing the previously issued notes and L Bonds. The Series L Bonds are structurally junior to all present and future obligations owned by the DLP Funding II subsidiary (which holds the life insurance collateral).

[]

Collateral:

The significant majority of the insurance policies we own are subject to a collateral arrangement with the agent for our revolving credit lender. The L Bonds are secured by the assets of GWG Holdings, Inc. not by life insurance policies.   The majority of their life insurance is held in a subsidiary, DLP Funding II, LLC and its associated master trust.  The L Bonds interest is structurally junior to the senior secured lender.

Risk to Your Income:
We depend upon cash distributions from our subsidiaries, and contractual restrictions on distributions to us or adverse events at one of our operating subsidiaries could materially and adversely affect our ability to pay our debts, including our obligations under the L Bonds, and to continue to operate our business.

Renewal:
Unless you notify GWG Holdings 15 days prior to maturity date of your intent to have your bonds repaid they will automatically renew.

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this

investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 Sherretz Subscription Agreement, Claimant Sherretz signed her acknowledgment that all "reports notices and information will be sent to the email address indicated: pauhanaboulder@gmail.com". The 2018 Sherretz Subscription Agreement[190] contained Claimant Sherretz's acknowledgement of the following under the penalties of perjury[191]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, Claimant Sherretz was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Sherretz acknowledged receipt, review and understanding of the materials and risks, and proceeded with her investment.

### M. Audry D. Trahan

Claimant Audry D. Trahan ("Claimant Trahan") has known Werts since 2011.[192] On or about November 13, 2020, Claimant Trahan individually completed a series of documents for her investment in L Bonds (the "2020 Trahan Investment") which included: 1) a CLS Client Profile Form, which included Claimant Trahan's acknowledgement of certain representations relating to

---

[190] *See* Exhibit "M-2".
[191] Id.
[192] *See* Exhibit "N", p. 2.

the investment, her income, net worth and receipt and review of the prospectus/offering documents (the "2020 Trahan Profile Form");[193] 2) CLS GWG L Bond Risk Acknowledgement Form wherein Claimant Trahan made certain acknowledgements concerning the L Bonds (the "2020 Trahan Risk Form");[194] 3) GWG Subscription Agreement which contained Claimant Trahan's acknowledgement of general suitability standards (the "2020 Trahan Subscription Agreement").[195]

In the 2020 Trahan Profile Form, Claimant Trahan signed her acknowledgement of the following relating to the 2020 Trahan Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[196]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[197]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[198]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[199]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[200]

---

[193] *See* Exhibit "N".
[194] *See* Exhibit "N-1".
[195] *See* Exhibit "N-2".
[196] *See* Exhibit "N", p. 7.
[197] Id.
[198] Id.
[199] Id.
[200] Id.

Claimant Trahan also completed a risk form when she invested in the L Bonds. In the 2020 Trahan Risk Form, Claimant Trahan signed her acknowledgment, with her respective initials next to each statement, including, without limitation, the following[201]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2020 Trahan Subscription Agreement, Claimant Trahan signed her acknowledgment that all "reports notices and information will be sent to the email address indicated: abonline.5280@gmail.com". The 2020 Trahan Subscription Agreement[202] contained Claimant Trahan's acknowledgement of the following under the penalties of perjury[203]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

---

[201] *See* Exhibit "N-1".
[202] *See* Exhibit "N-2".
[203] Id.

Based on the foregoing, Claimant Trahan was provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. Claimant Trahan acknowledged receipt, review and understanding of the materials and risks, and proceeded with her investment.

### N.  Jeffrey P. Van Buskirk and Kathleen M. Van Buskirk

Claimants Jeffrey P. Van Buskirk and Kathleen M. Van Buskirk (the "van Buskirk Claimants"), on or about November 27, 2018, jointly completed a series of documents for their investment in L Bonds (the "2018 van Buskirk Investment") which included: 1) a CLS Client Profile Form, which included the van Buskirk Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2018 van Buskirk Profile Form");[204] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the van Buskirk Claimants made certain acknowledgements concerning the L Bonds (the "2018 van Buskirk Risk Form");[205] 3) GWG Subscription Agreement which contained the van Buskirk Claimants' acknowledgement of general suitability standards (the "2018 van Buskirk Subscription Agreement").[206] On or about December 29, 2020, the van Buskirk Claimants made another investment into the L Bonds and jointly completed another series of documents for the investment (the "2020 van Buskirk Investment) which included: 1) a CLS Client Profile Form, which included the van Buskirk Claimants' acknowledgement of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2020 van Buskirk Profile Form");[207] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the van Buskirk Claimants made

---

[204] *See* Exhibit "O".
[205] *See* Exhibit "O-1".
[206] *See* Exhibit "O-2".
[207] *See* Exhibit "O-3".

certain acknowledgements concerning the L Bonds (the "2020 van Buskirk Risk Form");[208] 3) GWG L Bond Change of Investment Form (the "2020 van Buskirk L Bond Change Form").[209]

In the 2018 van Buskirk Profile Form and the 2020 van Buskirk Profile Form, the van Buskirk Claimants signed their acknowledgement of the following relating to the 2018 van Buskirk Investment and the 2020 van Buskirk Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[210]

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[211]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[212]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[213]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[214]

In the 2018 van Buskirk Risk Form and the 2020 van Buskirk Risk Form, the van Buskirk Claimants signed their acknowledgment, with their respective initials next to each statement, including, without limitation, the following[215]:

---

[208] *See* Exhibit "O-4".
[209] *See* Exhibit "O-5".
[210] *See* Exhibit "O", p. 7; Exhibit "O-3", p. 7.
[211] Id.
[212] Id.
[213] Id.
[214] Id.
[215] *See* Exhibit "O-1"; Exhibit "O-4".

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

In the 2018 van Buskirk Subscription, the van Buskirk Claimants signed their acknowledgment that all "reports notices and information will be sent to the email address indicated: kathleenvb1979@gmail.com". The 2018 van Buskirk Subscription Agreement[216] contained the van Buskirk Claimants' acknowledgement of the following under the penalties of perjury[217]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

In the 2020 van Buskirk L Bond Change Form, the van Buskirk Claimants changed the bond term to 7 years.[218]

---

[216] *See* Exhibit "O-2"; Exhibit "O-5".
[217] Id.
[218] *See* Exhibit "O-5".

Based on the foregoing, the van Buskirk Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The van Buskirk Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investments.

### O.  David S. Winters and Barbara A. Winters

Claimants David S. Winters and Barbara A. Winters (the "Winters Claimants") have known Werts since 2014.[219] On or about February 2, 2021, the Winters Claimants jointly completed a series of documents for their investment in L Bonds (the "2021 Winters Investment") which included: 1) a CLS Client Profile Form, which included the Winters Claimants' acknowledgements of certain representations relating to the investment, their income, net worth and receipt and review of the prospectus/offering documents (the "2021 Winters Profile Form");[220] 2) CLS GWG L Bond Risk Acknowledgement Form wherein the Winters Claimants made certain acknowledgements concerning the L Bonds (the "2021 Winters Risk Form");[221] 3) GWG Subscription Agreement which contained the Winters Claimants' acknowledgement of general suitability standards (the "2021 Winters Subscription Agreement").[222]

In the 2021 Winters Profile Form, the Winters Claimants signed their acknowledgements of the following relating to the 2021 Winters Investment:

- I (We) acknowledge that I (we) have received a prospectus for the product that I am (we are) purchasing. I (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and I (we) agree with the recommendation to purchase this product excluding fixed annuities.[223]

---

[219] *See* Exhibit "P", pp. 2-3.
[220] *See* Exhibit "P".
[221] *See* Exhibit "P-1".
[222] *See* Exhibit "P-2".
[223] *See* Exhibit "P", p. 7.

- The investor information contained on this form accurately describes my (our) investment objective, financial situation and employment as it pertains to this account, policy or contract.[224]

For Limited *Partnerships/ Private Placements*

- I (We) have received and read a current offering document for the Limited Partnership selected and understand the investment objectives and suitability requirements of the partnership.[225]

- I (We) understand that this is an illiquid investment, and should I (we) need to sell this asset at any time. I (We) risk selling at a loss, not finding any buyer or losing my (our) entire investment,[226]

- I (We) understand that a portion of the distributions received from this investment may represent a return of principal.[227]

In the 2021 Winters Risk Form, the Winters Claimants signed their acknowledgment, with their respective initials next to each statement, including, without limitation, the following[228]:

- I/we have received and carefully read the [] Prospectus and have had the opportunity to review all issues concerning GWG with my Financial Advisor.

- I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment.

- I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability.

- I/we believe this investment as outlined in the [] Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings.

---

[224] Id.
[225] Id.
[226] Id.
[227] Id.
[228] *See* Exhibit "P-1".

In the 2021 Winters Subscription Agreement, the Winters Claimants signed their acknowledgments that all "reports notices and information will be sent to the email address indicated: dbwinters@comcast.net". The 2021 Winters Subscription Agreement[229] contained the Winters Claimants' acknowledgements of the following under the penalties of perjury[230]:

- I/We have received a copy of the Prospectus, together with any related Prospectus Supplement;

- I/We hereby acknowledge that this investment in L Bonds is illiquid.

Based on the foregoing, the Winters Claimants were provided material disclosures about GWG's business and changes thereto, as well as the risks attendant to an investment in the L Bonds. The Winters Claimants acknowledged receipt, review and understanding of the materials and risks, and proceeded with their investment.

Based on the foregoing written acknowledgements by each of the Claimants, it is undoubtedly clear that during each time the Claimants invested or reinvested into the L Bonds, the Claimants were made aware of the speculative nature of the L Bond investment and assumed the risks set forth in the documents they executed.

Moreover, CLS maintained reasonable supervision relating to its obligations under SEC Regulation Best Interests ("Reg BI") which went into effect on June 30, 2020.  In or around June 30, 2020, CLS required that its associated persons complete a Best Interest Attestation (the "BI Attestation") which required an associated person to confirm they disclosed to a customer concerning an investment: the known commissions and fees and material facts including but not limited to conflicts of interest and material limitations.  The

---

[229] *See* Exhibit "P-2".
[230] Id.

BI Attestation further required an analysis of the recommendation including, without limitation, account investment goals, liquidity need and available investment options.

A BI Attestation was completed by Werts for each Claimant based on a Claimant specific analysis of the recommendation to invest in the L Bonds after Reg BI's effective date: 1) on or about January 4, 2021, Werts completed a BI Attestation for the Roluti Claimants regarding the January 2021 Investment and February 2021 Investment;[231] 2) on or about January 11, 2021, Werts completed a BI Attestation for the Duncan Claimants regarding the 2021 Duncan Investment;[232] 3) on or about August 18, 2020, Werts completed a BI Attestation for the Rolince Claimants regarding the 2020 Rolince Investment;[233] 4) on or about September 3, 2020, Werts completed a BI Attestation for Claimant Redmond regarding the 2020 Redmond Investment;[234] 5) on or about September 3, 2020, Werts completed a BI Attestation for Claimant Sanelli regarding the 2020 Sanelli Investment;[235] on or about November 12, 2020, Werts completed a BI Attestation for Claimant Trahan regarding the 2020 Trahan Investment;[236] 6) on or about December 21, 2020, Werts completed a BI Attestation for the van Buskirk Claimants regarding the 2020 van Buskirk Investment;[237] 7) on or about February 3, 2021, Werts completed a BI Attestation for the Winters Claimants regarding the 2021 Winters Investment.[238]

The documents and representations by the Claimants, both individually and jointly, as set forth in detail above, demonstrate that CLS has a reasonable system of supervision,

---

[231] *See* Exhibit "Q".
[232] *See* Exhibit "R".
[233] *See* Exhibit "S".
[234] *See* Exhibit "T".
[235] *See* Exhibit "U"
[236] *See* Exhibit "V".
[237] *See* Exhibit "W".
[238] *See* Exhibit "X".

verified that Claimants received clear disclosure of the risks related to their investments, were aware of the risks relating to their investments in the L Bonds and that the Claimants knowingly assumed such risks. As evidenced by the attachments hereto, Claimants have each individually or jointly made acknowledgements and representations relating to accepting the risks associated with the L Bonds. CLS cannot and should not be held liable for any damages to Claimants where Claimants expressly accepted all risks.

## AFFIRMATIVE DEFENSES

1.     Claimants fail to state a claim against Gould upon which relief may be granted.

2.     Claimants' claims are barred by the doctrine of *bespeaks caution* based on Claimants' receipt and acknowledgement of the documents containing specific and detailed cautionary language and risk factors pertaining to the issuer and the investments at issue.

3.     Gould acted in good faith because Cabot Lodge had a reasonable supervisory system to supervise its associated persons which Gould reasonably relied upon and which supervision was performed in a reasonable manner consistent with regulatory requirements.

4.     Gould cannot be liable because Cabot Lodge's involvement with Claimants' accounts was carried out in good faith.

5.     Claimants cannot show any false or misleading statements made by Cabot Lodge and therefore Gould cannot be held liable as a control person.

6.     Claimants cannot show that Gould acted with the intent to deceive.

7.     Gould did not directly or indirectly, induce the acts or acting constituting the alleged causes of action.

8.     Claimants' damages, if any, resulted from the alleged acts or omissions of former Cabot Lodge registered representative, Werts, which if proven, were done by Werts in

contravention of Cabot Lodge' policies and procedures and therefore, Gould cannot be held liable as a control person.

## INTRODUCTION

All prior paragraphs are incorporated herein by reference.

I.    **Claimants Cannot Support Control Person Liability Claims Against Gould**

*A.  Standard for Control Person Liability*

To establish a claim for control person liability under the Colorado Securities Act, Claimants must meet the statutory requirements set forth in Sec. 11-51-604(3), (5)(b) & (c) which provides:

> (3) Any person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1) or provides investment advisory services to another person in violation of section 11-51-501(5) or (6) is liable to the person buying or selling such security or receiving such services in connection with the violation for such legal or equitable relief that the court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorney fees.
>
> []
>
> (5)(b) Every person who, directly or indirectly, **controls a person liable under subsection (3) or (4) of this section is liable jointly and severally with and to the same extent as such controlled person, unless such controlling person sustains the burden of proof that such person acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action**. (Emphasis added)
> (c) Any person who knows that another person liable under subsection (3) or (4) of this section is engaged in conduct which constitutes a violation of section 11-51-501 and who gives substantial assistance to such conduct is jointly and severally liable to the same extent as such other person.

The Colorado state courts have noted that the language in section 11-51-604(5)(b) of the CSA is substantially similar to its federal counterpart, section 20(a) of the 1934 Act. Therefore,

while the state court is not bound by federal law in the interpretation of the CSA, the courts have found that "insofar as the provisions and purposes of [Colorado's] statute parallel those of the federal enactments, such federal authorities are highly persuasive" <u>Houston v Southeast Investments N.C., Inc</u>. 2017 COA 66, 399 P.3d 783 (2017), citing <u>Lowery v. Ford Hill Inv. Co.</u>, 192 Colo. 125, 129, 556 P.2d 1201, 1204 (1976).

In order to establish a *prima facie* case of control person liability, the Claimants must present evidence from which a reasonable fact finder could conclude that:

> (a) A primary violation of the securities laws occurred; and

> (b) The defendant controlled the person or entity committing the primary violation. *See* Houston

Pursuant to section 11-51-604(5)(b) and as stated above, a control person may avoid liability under this section if the control person can show that they acted in good faith and did not, directly or indirectly, induce the act or acts constituting the violation or cause of action.

The factors considered in assessing a good faith defense include, "The broker-dealer's defense that it established, maintained and enforced a proper system of supervision and control" is relevant to its good faith defense under section 20(a) of the 1934 Act. *See* <u>In re Bofl Holding, Inc. Securities Litigation</u> 2017 WL 2257980 (S.D. California) at 21, which cites as its source <u>Howard v Everex Systems, Inc.</u> 228 F.3d 1057 (2000) (9th Cir. Sep. 29, 2000) at 1066 Further, the good faith defense requires a showing that the control person did not act recklessly "in inducing, either by his action or his inaction, the act or acts constituting the violation." <u>G.A. Thompson & Co., Inc.</u>, 636 F.2d (5th Cir. Feb. 9, 1981) at 960.

## B. **Gould relied in good faith on Cabot Lodge's maintenance and enforcement of its reasonable system of supervision and compliance**.

Cabot Lodge had a reasonable system of supervision based on its business and designed to achieve compliance with applicable laws and rules including: 1) Cabot Lodge maintained written

supervisory procedures relating to due diligence on alternative investments; 2) Cabot Lodge performed a review of the L Bonds to evaluate the terms and risks associated with the investment, no offering of an alternative product could be made without the Investment Committee's prior approval of the product; 3) Cabot Lodge maintained written supervisory procedures pertaining the requirement for a registered representative to conduct product suitability and customer specific suitability; and 4) Cabot Lodge maintained written supervisory procedures and conducted supervisory reviews of customer subscription documents.

Moreover, Cabot Lodge utilized a third-party vendor respected in the financial industry, AI Insight, to provide the firm verification that its registered representatives were knowledgeable about the L Bonds. AI Insight independently tested Cabot Lodge's registered representatives' knowledge of the product in order to verify that its representatives were able to make product suitability determinations for their customers.  Cabot Lodge utilized the AI Insight's educational module to provide comprehensive product information relating to alternative investments including each of the L Bond offerings.  AI Insight populated the L Bond offering educational module for each new L Bond offering by posting GWG's SEC filings, providing summaries of the contents of the SEC filings and other important factors about each particular L Bond offering. Cabot Lodge's policies required and notified registered representatives that the firm required a registered representative who wanted to offer the L Bonds to pass AI Insight's specific testing module for the L Bond being offered.  Upon a registered representative submitting a customer's subscription document for an L Bond subscription, Cabot Lodge's supervisor(s) utilized AI Insight's compliance module to confirm that the submitting registered representative had passed the AI Insight testing module for the particular security. Cabot Lodge supervisor(s) rejected L

Bond subscription documents if he/she determined that the registered representative servicing the subscribing customer had not satisfactorily completed the AI Insight L bond product testing.

Cabot Lodge's integration of the comprehensive AI Insight platform, in addition to its other supervisory procedures, demonstrates that its system of supervision was reasonable for its business. Cabot Lodge made available product specific information to its registered representatives to learn product details in order for the registered representative to make a proper product suitability determination for customers.

Once the product suitability aspect was complete, it was the registered representative's responsibility to evaluate the product for their specific customer in light of that customer's individual needs and investment goals. Significantly, as a result of her federal benefits advisory business Werts collected a wealth of detailed financial information from her customers in order to complete financial projections and planning. By virtue of this unique position, Werts was the person in the best position to evaluate the customer's specific suitability for the L Bonds.

Gould was aware of the written supervisory procedures and was aware of the enforcement of such procedures. Therefore, Gould reasonably relied upon Cabot Lodge's supervisory system and processes. Since there were no red flags that Cabot Lodge's systems were not reasonably functioning, Gould will prove that he did not act recklessly in inducing violations.

### ADDITIONAL STATEMENT OF FACTS RELATING TO THIRD-PARTIES

1.    **Werts**

Werts under her Vanderslice name, authored a book <u>FedTelligence: The Ultimate Guide To Mastering Your Federal Benefits</u> which focused on retirement benefits that employees of the federal government, the USA's largest employer, were entitled to.

Werts using her particular "expertise" would obtain clients using Wert's services as a federal employee adviser. As a person that analyzed clients federal and other assets and retirement benefits doing a detailed analysis gave Ms. Wert's unique insight into each client.

On or about June 13, 2013, Werts entered into a Financial Advisor Independent Contractor Agreement with Cabot Lodge (the "Agreement")[239]. Pursuant to the Agreement, Werts acknowledged that she owed Cabot Lodge a duty of loyalty and to act in good faith.[240] Pursuant to the Agreement, Werts agreed to comply with applicable FINRA Rules, federal and state securities laws and Cabot Lodge Policies.

    i.    **Law, Rules, and Regulation.** In connection with all of Financial Advisor's activities hereunder, Financial Advisor hereby agrees that he/she shall comply with the Securities Act of 1933 ("the Act"), the Securities Exchange Act of 1934 ("the Exchange Act") and the investment Advisers Act of 1940 (the "Advisers Act") and all regulations promulgated thereunder, as well as any applicable laws and regulations of FINRA, the SEC, and any state where Securities and Insurance products will be offered for sale or purchase. Financial Advisor shall not make any statements, either verbal or written, regarding any Securities and/ or Insurance product which are untrue or misleading or which omit a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading. Financial Advisor may only solicit and execute Securities and Insurance transactions for products as defined by the Financial Advisor's registration, licensing and appointments and as otherwise restricted by the provisions hereof. Financial Advisor shall not make sales of any Securities or Insurance products in any state unless both Cabot Lodge and Financial Advisor are licensed and registered as a broker/dealer and agent to conduct the business described in this Agreement, as the case may be, or are exempt from such licensing and registration requirements in the opinion of counsel for Cabot Lodge. Cabot Lodge expressly reserves the right to withdraw its license in any state at any time.[241]

    ii.    **Written Supervisory Manual**. Financial Advisor acknowledges receipt of Cabot Lodge's Written Supervisory Manual ("'WSPs" or "Compliance Manual"). Financial Advisor shall study, implement and adhere to the procedures and standards set forth in Cabot Lodge's Compliance Manual,

---

[239] A copy of the Agreement is attached hereto as Exhibit "Y."
[240] *See* Exhibit "Y", Section A(I).
[241] *See* Exhibit "Y", Section (M).

including any periodic amendments to said WSPs. Financial Advisor acknowledges to have read said WSPs prior to selling any Securities and/or Insurance product to any client. Further, Financial Advisor shall submit to and fully cooperate with an annual or other compliance review by a Cabot Lodge Compliance Officer and make available all of Financial Advisor's records, transactions, procedures, files and any and all other evidence of performance to ensure compliance with Cabot Lodge's Compliance Manual.[242]

The Agreement further provides that Cabot Lodge is entitled to indemnification as a result of any costs related to any arbitration resulting from Werts' conduct.

Upon notice of a Claim (as hereinafter defined), Financial Advisor agrees to immediately indemnify, defend, and hold Cabot Lodge and/or the other members of the Cabot Lodge Group harmless against any and all claims and all losses, insurance deductibles, retentions, reasonable attorney's fees, and costs related to such Claims including, without limitation, any and all investigations, regulatory actions, regulatory inquiries, OTRs, Wells Letters, investigations, and litigation including, without limitation, discovery, mediations, arbitrations, court actions, depositions, motions, and appellate courts. Cabot Lodge has the right to set off any compensation earned by Financial Advisor through Cabot Lodge for defense costs, indemnity, losses, costs and expenses arising out of any Claims. Further, if a lawsuit, arbitration, regulatory inquiry, or regulatory action is commenced or threatened, which could be covered under Cabot Lodge's right to be indemnified, Cabot Lodge has the right, at its sole discretion, to withhold any or all of Financial Advisor's compensation earned hereunder and not yet paid to Financial Advisor to establish a reserve fund to be held by Cabot Lodge to pay the anticipated and/or actual losses, claims, costs and/or expenses asserted against Financial Advisor and/or Cabot Lodge and/or any other indemnified person.

A "Claim" shall mean and include, without limitation, a regulatory inquiry, regulatory action, demand, claim, arbitration, counterclaim or action against Cabot Lodge and/or any other member of the Cabot Lodge Group related to: (1) Financial Advisor's breach of any representation, warranty, covenant or obligation contained in this Agreement; (2) Financial Advisor's violation or claimed violation of any state or federal law; (3) Financial Advisor's violation or claimed violation of any rule or regulation of any state or federal regulatory body or self-regulatory organization such as FINRA; (4) Financial Advisor's violation or claimed violation of Cabot Lodge's Compliance Manual; (5) errors or claimed errors committed by Financial Advisor; and (6) claims asserted against

---

[242] *See* Exhibit "Y", Section A(III)(II)(H)(ii).

Cabot Lodge by Financial Advisor's customers, contractors, or vendors that are based on Financial Advisor's alleged misconduct including, without limitation, as described in items (1) through (5) herein. A Claim includes such claims which arose as a result of acts or omissions which may have occurred before, during, or after the commencement or termination of this Agreement.

Any and all indemnified persons having a right to a defense hereunder shall have the immediate right of payment from Financial Advisor for costs and attorneys' fees related to his/her/its defense, and may seek an immediate award and payment through the legal and equitable powers of any court or arbitration panel at any time during the subject matter proceedings, and if an action or motion requesting relief under this paragraph is brought to enforce same, then claimant shall be entitled to an additional award for their reasonable attorney's fees and costs related to said motion.

Cabot Lodge's and the Cabot Lodge Group's rights in this section related to defense and indemnification contained herein shall survive the termination of this Agreement. The parties hereto agree that each member of the Cabot Lodge Group is a third-party beneficiary of this Agreement.[243]

Cabot Lodge had every reason to reasonably believe that Ms. Werts was familiar with the risks attendant to investments in the L Bonds.

Ms. Werts had periodically reviewed and submitted to AI Insight's educational, testing and processes to confirm that she was familiar with the material aspects of the risks and benefits of investments in L Bonds. Ms. Werts was familiar with the risks of an investment in the L Bonds. Ms. Werts was knowledgeable and trained to determine product suitability for her customers that she introduced to Cabot Lodge. Moreover, Werts got approximately 90% of the commissions generated in connection with the L Bond investments

Upon information and belief, after Werts developed a working relationship with the Claimants, Werts recommended to the Claimants to invest in a particular L Bond. At various times as set forth above in detail, Werts obtained from Claimants a completed and enhanced series of

---

[243] *See* Exhibit "Y", Section A(III)(II)(M).

documents relating to their understanding of the L Bond investment, receipt and review of documents containing disclosures and acceptance of the related risks.

Werts had a duty to conduct a determination of each Claimant's investment profile, goals, and objectives.  Werts was required by Cabot Lodge policies and procedures as well as FINRA rules to only make suitable recommendations to each Claimant based on his/her/their investment profile. If the allegations in the 4ASOC are proven, it is clear that Werts is liable to Cabot Lodge, and Gould as a control person, for violating multiple provisions of her Agreement. Werts was, as the registered representative, the primary person responsible for determining the suitability and integrity of the investments for the Claimants. The alleged misrepresentations by Werts, if true, were in violation of Cabot Lodge policies and procedures and FINRA rules.  As a result, Werts is solely responsible for her bad acts towards the Claimants, and Werts is responsible for her deceptive conduct towards Cabot Lodge and Gould as a control person.

### 2.    Dan Werts

Dan Werts was a registered person with Cabot Lodge from February 2016 to April 21, 2021, and conducted business as part of Werts' office.  Upon information and belief, Dan Werts had contact with some or all of Claimants in connection with their investments in GWG.  On December 5, 2016 Dan Werts entered into a Financial Advisor Independent Contractor Agreement ("Dan Werts Agreement")[244] with Cabot Lodge.

Pursuant to the Dan Werts Agreement, Dan Werts agreed to comply with applicable FINRA Rules, federal and state securities laws and Cabot Lodge Policies.

> i.    **Law, Rules, and Regulation.** In connection with all of Financial Advisor's activities hereunder, Financial Advisor hereby agrees that he/she shall comply with the Securities Act of 1933 ("the Act"), the Securities Exchange Act of 1934 ("the Exchange Act")

---

[244] A copy of the Dan Werts Agreement is attached hereto as Exhibit "Z."

and the investment Advisers Act of 1940 (the "Advisers Act") and all regulations promulgated thereunder, as well as any applicable laws and regulations of FINRA, the SEC, and any state where Securities and Insurance products will be offered for sale or purchase. Financial Advisor shall not make any statements, either verbal or written, regarding any Securities and/ or Insurance product which are untrue or misleading or which omit a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading. Financial Advisor may only solicit and execute Securities and Insurance transactions for products as defined by the Financial Advisor's registration, licensing and appointments and as otherwise restricted by the provisions hereof. Financial Advisor shall not make sales of any Securities or Insurance products in any state unless both Cabot Lodge and Financial Advisor are licensed and registered as a broker/dealer and agent to conduct the business described in this Agreement, as the case may be, or are exempt from such licensing and registration requirements in the opinion of counsel for Cabot Lodge. Cabot Lodge expressly reserves the right to withdraw its license in any state at any time.[245]

ii.   **Written Supervisory Manual**. Financial Advisor acknowledges receipt of Cabot Lodge's Written Supervisory Manual ("'WSPs" or "Compliance Manual"). Financial Advisor shall study, implement and adhere to the procedures and standards set forth in Cabot Lodge's Compliance Manual, including any periodic amendments to said WSPs. Financial Advisor acknowledges to have read said WSPs prior to selling any Securities and/or Insurance product to any client. Further, Financial Advisor shall submit to and fully cooperate with an annual or other compliance review by a Cabot Lodge Compliance Officer and make available all of Financial Advisor's records, transactions, procedures, files and any and all other evidence of performance to ensure compliance with Cabot Lodge's Compliance Manual.[246]

The Dan Werts Agreement further provides that Cabot Lodge, and Gould, are entitled to indemnification as a result of any costs related to any arbitration resulting from Dan Werts' conduct.

Upon notice of a Claim (as hereinafter defined), Financial Advisor agrees to immediately indemnify, defend, and hold Cabot Lodge and/or the

---

[245] *See* Exhibit "Z", Section H(i).
[246] *See* Exhibit "Z", Section (H)(ii).

other members of the Cabot Lodge Group harmless against any and all claims and all losses, insurance deductibles, retentions, reasonable attorney's fees, and costs related to such Claims including, without limitation, any and all investigations, regulatory actions, regulatory inquiries, OTRs, Wells Letters, investigations, and litigation including, without limitation, discovery, mediations, arbitrations, court actions, depositions, motions, and appellate courts. Cabot Lodge has the right to set off any compensation earned by Financial Advisor through Cabot Lodge for defense costs, indemnity, losses, costs and expenses arising out of any Claims.  Further, if a lawsuit, arbitration, regulatory inquiry, or regulatory action is commenced or threatened, which could be covered under Cabot Lodge's right to be indemnified, Cabot Lodge has the right, at its sole discretion, to withhold any or all of Financial Advisor's compensation earned hereunder and not yet paid to Financial Advisor to establish a reserve fund to be held by Cabot Lodge to pay the anticipated and/or actual losses, claims, costs and/or expenses asserted against Financial Advisor and/or Cabot Lodge and/or any other indemnified person.

A "Claim" shall mean and include, without limitation, a regulatory inquiry, regulatory action, demand, claim, arbitration, counterclaim or action against Cabot Lodge and/or any other member of the Cabot Lodge Group related to: (1) Financial Advisor's breach of any representation, warranty, covenant or obligation contained in this Agreement; (2) Financial Advisor's violation or claimed violation of any state or federal law; (3) Financial Advisor's violation or claimed violation of any rule or regulation of any state or federal regulatory body or self-regulatory organization such as FINRA; (4) Financial Advisor's violation or claimed violation of Cabot Lodge's Compliance Manual; (5) errors or claimed errors committed by Financial Advisor; and (6) claims asserted against Cabot Lodge by Financial Advisor's customers, contractors, or vendors that are based on Financial Advisor's alleged misconduct including, without limitation, as described in items (1) through (5) herein. A Claim includes such claims which arose as a result of acts or omissions which may have occurred before, during, or after the commencement or termination of this Agreement.

Any and all indemnified persons having a right to a defense hereunder shall have the immediate right of payment from Financial Advisor for costs and attorneys' fees related to his/her/its defense, and may seek an immediate award and payment through the legal and equitable powers of any court or arbitration panel at any time during the subject matter proceedings, and if an action or motion requesting relief under this paragraph is brought to enforce same, then claimant shall be entitled to

an additional award for their reasonable attorney's fees and costs related to said motion.

Cabot Lodge's and the Cabot Lodge Group's rights in this section related to defense and indemnification contained herein shall survive the termination of this Agreement. The parties hereto agree that each member of the Cabot Lodge Group is a third-party beneficiary of this Agreement.[247]

Cabot Lodge, and Gould as a control person, had every reason to reasonably believe that Dan Werts was familiar with the risks attendant to investments in the L Bonds. Dan Werts had reviewed and submitted to AI Insight's educational, testing and processes to confirm that he was familiar with the material aspects of the risks and benefits of investments in L Bonds. Accordingly, Dan Werts was familiar with the risks of an investment in the L Bonds.

Upon information and belief, Dan Werts, at the direction of Werts, facilitated the Claimants' investments in the L Bonds. Upon information and belief, Dan Werts communicated with some or all of the Claimants to complete subscription paperwork, follow up on Claimants' questions and communicated with the issuer to facilitate Claimants' investments.

Dan Werts had a duty to comply with Cabot Lodge's written procedures and FINRA rules. The alleged misrepresentations by Werts, if true, were facilitated by Dan Werts. Such conduct was in violation of Cabot Lodge policies and procedures and FINRA rules and a breach of the Dan Werts Agreement. As a result, Dan Werts is solely responsible for his bad acts towards the Claimants and liable for his deceptive conduct towards Cabot Lodge and Gould as a control person.

### 3.    Ashley Robinson

Ashley Robinson ("Robinson") was a registered person with Cabot Lodge from December 2015 to April 2021, and conducted business as part of Werts' office. Upon information and belief,

---

[247] *See* Exhibit "Z", Section M.

Robinson had contact with some or all of Claimants in connection with their investments in GWG. On November 2, 2015 Robinson entered into a Financial Advisor Independent Contractor Agreement ("Robinson Agreement")[248] with Cabot Lodge.

Pursuant to the Robinson Agreement, Robison agreed to comply with applicable FINRA Rules, federal and state securities laws and Cabot Lodge Policies.

i. **Law, Rules, and Regulation.** In connection with all of Financial Advisor's activities hereunder, Financial Advisor hereby agrees that he/she shall comply with the Securities Act of 1933 ("the Act"), the Securities Exchange Act of 1934 ("the Exchange Act") and the investment Advisers Act of 1940 (the "Advisers Act") and all regulations promulgated thereunder, as well as any applicable laws and regulations of FINRA, the SEC, and any state where Securities and Insurance products will be offered for sale or purchase. Financial Advisor shall not make any statements, either verbal or written, regarding any Securities and/ or Insurance product which are untrue or misleading or which omit a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading. Financial Advisor may only solicit and execute Securities and Insurance transactions for products as defined by the Financial Advisor's registration, licensing and appointments and as otherwise restricted by the provisions hereof. Financial Advisor shall not make sales of any Securities or Insurance products in any state unless both Cabot Lodge and Financial Advisor are licensed and registered as a broker/dealer and agent to conduct the business described in this Agreement, as the case may be, or are exempt from such licensing and registration requirements in the opinion of counsel for Cabot Lodge. Cabot Lodge expressly reserves the right to withdraw its license in any state at any time.[249]

ii. **Written Supervisory Manual**. Financial Advisor acknowledges receipt of Cabot Lodge's Written Supervisory Manual ("'WSPs" or "Compliance Manual"). Financial Advisor shall study, implement and adhere to the procedures and standards set forth in Cabot Lodge's Compliance Manual, including any periodic amendments to said WSPs. Financial Advisor acknowledges to have read said WSPs prior to selling any Securities and/or Insurance product to any client. Further, Financial Advisor shall submit to and fully cooperate with an annual or other compliance

---

[248] A copy of the Robinson Agreement is attached hereto as Exhibit "AA."
[249] *See* Exhibit "AA", Section H(i).

> review by a Cabot Lodge Compliance Officer and make available all of Financial Advisor's records, transactions, procedures, files and any and all other evidence of performance to ensure compliance with Cabot Lodge's Compliance Manual.[250]

The Robinson Agreement further provides that Cabot Lodge, and Gould, are entitled to indemnification as a result of any costs related to any arbitration resulting from Robinson's conduct.

> Upon notice of a Claim (as hereinafter defined), Financial Advisor agrees to immediately indemnify, defend, and hold Cabot Lodge and/or the other members of the Cabot Lodge Group harmless against any and all claims and all losses, insurance deductibles, retentions, reasonable attorney's fees, and costs related to such Claims including, without limitation, any and all investigations, regulatory actions, regulatory inquiries, OTRs, Wells Letters, investigations, and litigation including, without limitation, discovery, mediations, arbitrations, court actions, depositions, motions, and appellate courts. Cabot Lodge has the right to set off any compensation earned by Financial Advisor through Cabot Lodge for defense costs, indemnity, losses, costs and expenses arising out of any Claims.  Further, if a lawsuit, arbitration, regulatory inquiry, or regulatory action is commenced or threatened, which could be covered under Cabot Lodge's right to be indemnified, Cabot Lodge has the right, at its sole discretion, to withhold any or all of Financial Advisor's compensation earned hereunder and not yet paid to Financial Advisor to establish a reserve fund to be held by Cabot Lodge to pay the anticipated and/or actual losses, claims, costs and/or expenses asserted against Financial Advisor and/or Cabot Lodge and/or any other indemnified person.

> A "Claim" shall mean and include, without limitation, a regulatory inquiry, regulatory action, demand, claim, arbitration, counterclaim or action against Cabot Lodge and/or any other member of the Cabot Lodge Group related to: (1) Financial Advisor's breach of any representation, warranty, covenant or obligation contained in this Agreement; (2) Financial Advisor's violation or claimed violation of any state or federal law; (3) Financial Advisor's violation or claimed violation of any rule or regulation of any state or federal regulatory body or self-regulatory organization such as FINRA; (4) Financial Advisor's violation or claimed violation of Cabot Lodge's Compliance Manual; (5) errors or claimed errors committed by Financial Advisor; and (6) claims asserted against

---

[250] *See* Exhibit "AA", Section (H)(ii).

Cabot Lodge by Financial Advisor's customers, contractors, or vendors that are based on Financial Advisor's alleged misconduct including, without limitation, as described in items (1) through (5) herein. A Claim includes such claims which arose as a result of acts or omissions which may have occurred before, during, or after the commencement or termination of this Agreement.

Any and all indemnified persons having a right to a defense hereunder shall have the immediate right of payment from Financial Advisor for costs and attorneys' fees related to his/her/its defense, and may seek an immediate award and payment through the legal and equitable powers of any court or arbitration panel at any time during the subject matter proceedings, and if an action or motion requesting relief under this paragraph is brought to enforce same, then claimant shall be entitled to an additional award for their reasonable attorney's fees and costs related to said motion.

Cabot Lodge's and the Cabot Lodge Group's rights in this section related to defense and indemnification contained herein shall survive the termination of this Agreement. The parties hereto agree that each member of the Cabot Lodge Group is a third-party beneficiary of this Agreement.[251]

Cabot Lodge, and Gould as a control person, had every reason to reasonably believe that Robinson was familiar with the risks attendant to investments in the L Bonds. Robinson had reviewed and submitted to AI Insight's educational, testing and processes to confirm that she was familiar with the material aspects of the risks and benefits of investments in L Bonds. Robinson was familiar with the risks of an investment in the L Bonds.

Upon information and belief, Robinson, on her own and at the direction of Werts, facilitated the Claimants' investments in the L Bonds. Upon information and belief, Robinson communicated with some or all of the Claimants to complete subscription paperwork, follow up on Claimants' questions and communicated with the issuer to facilitate Claimants' investments.

---

[251] *See* Exhibit "AA", Section M.

Robinson had a duty to comply with Cabot Lodge's written procedures and FINRA rules. The alleged misrepresentations by Werts, if true, were facilitated by Robinson. Such conduct was in violation of Cabot Lodge policies and procedures and FINRA rules and a breach of the Robinson Agreement. As a result, Robinson is solely responsible for her bad acts towards the Claimants and liable for his deceptive conduct towards Cabot Lodge and Gould as a control person.

### 4.    Madison

Madison is a broker-dealer registered with FINRA. In or around April 2021, Werts, Dan Werts and Robinson became associated with Madison. In or around April 2021, Werts, Dan Werts and Robinson transferred or attempted to transfer their customer accounts to Madison, including but not limited to Claimants' accounts.

A broker-dealer has an obligation to review customer accounts that are transferred from another broker-dealer. In connection with non-transferable assets, FINRA Rule 11870(c)(1)(B) provides that, the customer will be contacted in writing by the carrying member, and/or by the receiving member, with respect to the disposition of nontransferable assets other than proprietary money market fund assets (if any), indicated in an instruction to transfer specifically designated account assets. FINRA Rule 11870(k)(1) provides that, it is the responsibility of the receiving member to obtain the approval of its custodian/trustee accepting a customer's retirement plan securities account before submitting a transfer instruction for such account assets to the carrying member or its custodian/trustee to facilitate transfer of the account assets.

Upon information and belief, in or around April 2021, each of the Claimants' transferred their accounts to Madison when Werts moved from Cabot Lodge to Madison. Upon information and belief, some of the Claimants' accounts were retirement accounts. At the time Claimants moved their accounts to Madison, each Claimant had investment(s) in the L Bonds. Madison

claimed it did not have the ability to maintain the L Bonds.  Werts had a duty to Claimants to notify each Claimant that Madison could not maintain each of the Claimants' investment(s) in the L Bonds.  In or around April 2021, when Werts transferred to Madison, Werts had an obligation to advise each Claimant that they could submit a request to GWG to redeem their bonds because Madison could not maintain Claimants' investment(s) in the L Bonds. If Werts had notified Claimants in April 2021 of Madison's inability to maintain the L Bond investments, Claimants could have avoided losses. Madison failed to supervise Werts' communication with the customers she transferred to Madison.  As a result, Werts and Madison left the Claimants without any information or resources relating to the L Bonds Werts recommended and sold to each Claimant.

In or around January 2022, while the Claimants' accounts were at Madison, GWG notified its bond holders, including Claimants, that it was unable to pay the interest due on the L Bonds. In April 2022, GWG filed for bankruptcy. Madison had a duty to supervise the Claimants' accounts while those accounts were maintained at Madison.  Madison abdicated its responsibility to Claimants in connection with the L Bonds and the bankruptcy which occurred during the time the Claimants had accounts at Madison.  Essentially, Madison tried to keep all the Werts introduced accounts without regard for disclosure to the Claimants of their refusal to accept the L Bonds.

### COUNT I
### <u>CLAIM OVER</u>
### <u>(Against Werts, Dan Werts and Robinson)</u>

All prior paragraphs of this amended answer are incorporated herein by reference.

In the event that Cabot Lodge and Gould are found to have any liability to the Claimants then and in such event Third-Party Respondents Werts, Dan Werts and Robinson should be found to be liable to Cabot Lodge and Gould for that liability and the costs and disbursements related thereto.

**COUNT II**
**INDEMNIFICATION**
**(Against Werts, Dan Werts and Robinson)**

As set forth in the Agreement, Werts, Dan Werts and Robinson are liable for all damages, reasonable attorneys' fees, and costs associated with Cabot Lodge defending itself from the claims alleged in this action. Werts must indemnify Cabot Lodge, and Gould as a control person, for such losses because this arbitration against Cabot Lodge relates to Werts', Dan Werts' and Robinson's "violation or claimed violation of any rule or regulation of any state or federal regulatory body or self-regulatory organization such as FINRA" and is therefore precisely the type of "Claim" the Agreement envisioned with respect to indemnification.  Furthermore, each of the Agreements provides that even though the Agreement has terminated, "Cabot Lodge's and the Cabot Lodge Group's rights in this section related to defense and indemnification contained herein shall survive []." As such, Werts, Dan Werts and Robinson cannot argue that the termination of their relationship with Cabot Lodge absolves his obligation to indemnify Cabot Lodge, and Gould as a control person, for any and all losses stemming from this arbitration.

**COUNT III**
**ATTORNEYS' FEES**
**(Against Werts, Dan Werts and Robinson)**

Pursuant to the Agreement, Werts, Dan Werts and Robinson are liable for all of Cabot Lodge' and Gould's attorneys' fees in connection with this arbitration. The Werts, Dan Werts and Robinson Agreements (collectively the "Agreements") provide that "if any [] arbitration or other proceeding is brought by Cabot Lodge [] because of Financial Advisor's failure to abide by the terms of this Agreement, violation of state or federal law, or the violation of FINRA rules, Cabot Lodge [] shall be entitled to recover reasonable attorneys' fees and other costs incurred in collecting sums owed []." Because this proceeding is precisely the Claim the Agreements envisioned with

respect to attorneys' fees, Cabot Lodge, and Gould as control person, is entitled to Werts, Dan Werts and Robinson's payment of attorneys' fees in connection with defending this matter.

**COUNT IV**
**(Against Madison)**

Once Madison registered Werts, Dan Werts and Robinson (the "RR Group") as registered representatives and associated persons of Madison, Madison had a duty to those clients that the RR Group introduced to Madison to treat them in a fair and fully disclosed manner.

Neither the RR Group nor Madison made any effort to disclose to the Claimants that Madison would not accept the L Bonds into the Claimants' accounts at Madison introduced to its clearing firm on a fully disclosed basis.

Had the RR Group and Madison advised each of the RR Group's introduced customers to the action of Madison in refusing to accept the customers' L Bonds positions into their Madison accounts, these customers would have had the opportunity to cash in their L Bonds from GWG in accordance with the terms of the GWG governing documents from L Bonds.

By virtue of the conduct described above, Madison failed to supervise the conduct of the RR Group and failed to treat the Claimants in a just and equitable way resulting in Claimants' damages and Madison should be liable to Respondent Gould if there is a determination that Gould is liable to Claimants.

**CONCLUSION**

For the foregoing reasons, Gould respectfully requests that the Panel 1) deny the 4ASOC in its entirety as to Gould; 2) award Gould compensatory damages in connection with his Claim over against Werts, Dan Werts and Robinson; (3) award Gould compensatory damages in connection with his claim against Madison; and 4) indemnify Gould for all costs and fees; (4) award Gould attorneys' fees in connection with defending this matter; and grant any further relief

that the Panel deems just and equitable.

Dated: New York, New York
         June 1, 2023

                      Respectfully submitted,

                      **GUSRAE KAPLAN NUSBAUM PLLC**

         By:     *S/Martin H. Kaplan*
                 Martin H. Kaplan, Esq.
                 Robyn D. Paster, Esq.
                 120 Wall Street, 25th Floor
                 New York, New York 10005
                 Tel: (212) 269-1400
                 Email: rpaster@gusraekaplan.com