FINANCIAL INDUSTRY REGULATORY AUTHORITY
OFFICE OF DISPUTE RESOLUTION

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MATTHEW AND JOHN PETERSON,            :
                                      :
Claimants,                            :
                                      :      FINRA No. 23-00402
v.                                    :
                                      :
CABOT LODGE SECURITIES, LLC,          :
                                      :
Respondent.                           :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## RESPONDENT'S STATEMENT OF
## ANSWER AND THIRD-PARTY CLAIM

Respondent Cabot Lodge Securities, LLC ("Cabot," "CLS," or "Respondent") hereby submits its Statement of Answer in response to the Statement of Claim, dated February 16, 2023, (the "Claim" or "SOC") filed by Claimants Matthew Peterson and John Peterson ("Claimants") in the above-captioned arbitration, and asserts a third-party claim against former registered representative Ann Louise Werts, née Vanderslice ("Werts").

## STATEMENT OF ANSWER

Cabot denies all allegations of wrongdoing and denies any liability to Claimants for damages in any amount under any theory. Any allegation in the Claim not specifically addressed herein is denied.

## INTRODUCTION

Claimants, without naming the registered representative who lies at the heart of this matter, seek to recover for her actions from Cabot on theories of inadequate due diligence, *respondeat* superior and vicarious liability. However, Cabot conducted rigorous due diligence on the security at issue and appropriately supervised this purchase.

Claimants allege 1) Breach of Fiduciary Duty, 2) Negligence and Negligent Misrepresentation, 3) Breach of Contract, 4) Failure to Supervise, 5) Negligence – Violation of Regulation Best Interest. But CLS owed no fiduciary duty to Claimants under the law, committed no negligence or negligent misrepresentation, breached no contract, and followed Regulation Best Interest. SOC p. 12-16. Fundamentally, CLS conducted rigorous due diligence on the underlying security, properly operated its system of supervision, and committed no violations. Any violations that Werts committed occurred in breach of her contract with Cabot. For all these reasons and those set forth below, Claimants' false claim should be denied in its entirety.

## FACTUAL BACKGROUND

Claimants allegedly purchased $35,000 of a security which was recommended by Ms. Ann Louise Werts. Claimants allege that their investments in the L Bonds were based on misrepresentations that the L Bonds were a safe investment. Claimants allege that Cabot did so to gain selling commissions.

Ms. Werts is a registered representative who left Cabot in 2021 as indicated on her FINRA BrokerCheck Report, attached hereto as **Exhibit A**. Ms. Werts focused her practice on financial advice concerning federal benefits in retirement and investing. Ms. Werts was an independent contractor of Cabot who agreed to follow all laws, regulations, procedures, and FINRA Rules when she affiliated with Cabot. Ms. Werts received 90% of any selling commissions for her sales of L Bonds.

GWG Holdings, Inc. is a publicly traded financial services company primarily focused on the life insurance and investment sectors. The company specializes in acquiring and managing a diverse portfolio of life insurance policies, which are in-force and issued by highly-rated insurance carriers in the United States. One of GWG's main businesses is the

purchase of life insurance policies on the secondary market, often referred to as life settlements. In this process, policyholders who no longer need or want their policies sell them to investors at a discount from the face value. The investors then take over the premium payments and eventually receive the death benefits when the insured passes away. This process can provide liquidity to policyholders who may be in need of funds or wish to reallocate their assets.

GWG itself is a NASDAQ listed company whose market capitalization at December 29, 2017 was $48,368,777.60[1] (price $8.32 per share), December 31, 2018 was $291,550,362 (price $8.83 per share), December 31, 2019 was $324,391,847 (price $9.82 per share), December 30, 2020 was $231,331,701 (price $6.99 per share) and December 30, 2021 was $230,035,485 (price $6.95 per share).[2] For many years, then, the market valued GWG's business in the hundreds of millions of dollars, a valuation considered by Cabot while reviewing this offering.[3]

GWG sold an investment product called L Bonds and disclosed in its prospectus that it intended to use the net proceeds from the L Bond sales to purchase and finance additional life insurance assets, service and retire other outstanding debt, pay premiums on the life insurance assets, and pay principal amounts owing under previously issued notes or L Bonds. GWG sold the L bonds through broker-dealers. At one point in time, GWG had a network of approximately 145 member firms and registered investment advisors involved in the sale of

---

[1] The market capitalization was computed by ascertaining the closing price for GWG Holdings, Inc. common shares on the date set forth and multiplying this price by the total numbers of shares of common stock outstanding for each respective year.

[2] The market capitalization for December 30, 2021 was calculated based on the available information, the price per share on December 30, 2021 and the outstanding common shares of GWG Holdings, Inc. as reported for the period November 9, 2021 in GWG Holding Inc.'s Form 10-Q filed on November 19, 2021.

[3] It is noteworthy that approximately $1.4 billion was invested in L Bonds by a multitude of customers of other broker-dealers.

the L Bonds, and approximately $1.4 billion was invested in L Bonds by a multitude of customers of other broker-dealers.

Ultimately, as discussed in detail below, these investments did not work out as hoped for investors and GWG Holdings filed for Chapter 11 bankruptcy protection. In the wake of that filing, claimants' counsel have aggressively advertised online to bring boilerplate contingency cases against any and all broker-dealers that sold L Bonds, and respondent broker-dealers have been forced to defend against a wave of meritless claims.

**A.      Claimants Represented Themselves as Suitable for the Purchase and Cabot Had No Reason to Believe They Weren't.**

Claimants Matthew A. Peterson and John E. Peterson II signed up for a joint account to purchase the L Bonds (Cabot Lodge Securities Client Profile Form, attached hereto as **Exhibit B**). Claimants filled out and executed multiple forms attesting to their suitability for the investment. Claimants selected an investment objective of "Growth," an annual income of $170,000 and an estimated net worth and liquid net worth of $1,500,000. *Id.* at 5. They indicated that this investment would compose "Less than 1/3 of my financial portfolio." *Id.* They indicated no "Special Expenses" in the future and no "Liquidity Needs" whatsoever. *Id.* at 6.

Claimants executed extensive acknowledgments on the subscription agreement. They indicated: "(We) acknowledge that . . . (we) have received a prospectus for the product that . . . (we are) purchasing. . . (We) have discussed the material information in the prospectus, including charges and expenses, with my representative, and . . . (we) agree with the recommendation to purchase this product excluding fixed annuities." *Id.* at 7.

On the last page of the Client Profile Form, above their signatures, Claimants filled in the blank that "This investment represents 2.3% of estimated net worth" and "Liquid net

worth." They indicated that they received the "Prospectus/Offering Documents" for the investment on June 15, 2020. They signed their names, acknowledging and agreeing "that the information provided on this form is true, accurate and complete":



*Id.* at 8.

Claimants filled out an additional "Alternative Investment Risk Acknowledgment Form" attached hereto as **Exhibit C**. On that form, they again indicated their names, their annual income ($170,000), their liquid net worth ($1,500,000), the amount of their investment ($35,000) and the percentage of their liquid net worth that the investment composed (2.3%). They each made six acknowledgements as to (1) their receipt and review of the offering documents, (2) their awareness that the investment involved "a substantial degree of risk including but not limited to losing [the] entire investment, (3) that the investment was illiquid, (4) that they believed the investment was "suitable" for them based on their risk tolerance, overall investment objectives, financial status, and other security holdings, (5) that no more than 30% of their liquid net worth was tied up in the investment, and (6) that neither their financial advisor nor Cabot Lodge Securities, LLC made any guarantees of income or return in relation to the investment. *Id.* They each represented their acknowledgments as to each and every one of these statements with their initials:

**I/we acknowledge the following (Please initial each item)**

Alternative investments such as Direct Participation Programs, Limited Partnerships, Private Funds, REITs and Public Non-traded REITs, BDC's and Interval Funds involve substantial risks, and are not suitable for all investors particularly where the person investing has a low tolerance for risk. By signing below you acknowledge:

I/we have received and carefully read the Private Placement Memorandum or Prospectus and have had the opportunity to review all issues concerning this investment with my Financial Advisor

I/we understand investing in Alternative Investments involves a substantial degree of risk including but not limited to losing your entire investment

I/we understand this investment is illiquid and access to my/our principal investment once funds are accepted may not occur for several years. I/we have sufficient liquid assets and locking up funds in this investment will not place any unnecessary burden on my/our financial stability

I/we believe this investment as outlined in the Private Placement Memorandum or Prospectus is suitable for me/us at the time of making the investment based on my/our risk tolerance, overall investment objectives, financial status, and other security holdings

I/we understand, as with any investment, it is not appropriate to over allocate to any asset class or individual investment that would be disproportionate to my/our liquid net worth. I/we affirm that no more than 30/% of my/our liquid net worth, including this transaction, is invested in Direct Participation Programs, REIT's, Limited Partnerships, Reg D's, and other illiquid investments.

I/we affirm that neither my/our Financial Advisor nor Cabot Lodge Securities, LLC has made any guarantees of income or return in relation to this investment.

Client Signature 06-18-2020    Joint Client Signature 06/18/2020
Date                            Date

MATTHEW A. PETERSON    JOHN E. PETERSON
Printed Name                Printed Name

*Id.* Cabot's investors in L Bonds also often fill out an additional GWG L Bond Risk Acknowledgment Form, attached hereto as **Exhibit D**.

GWG Holdings, Inc., also included an L Bonds Subscription Agreement, attached hereto as **Exhibit E**. That form also outlined a wide array of statements concerning "Suitability Standards" that both Claimants declared and certified under "penalties of perjury." These again affirmed that Claimants had received the prospectus and any supplements and that the "investment in L Bonds is illiquid." *Id.* Both Claimants initialed each and every one of the acknowledgments:



*Id.*

Ms. Werts also signed each of the relevant forms in the Subscription Agreements. By the time that Cabot Lodge Securities received all of the forms, everything was in good order for supervisory approval.

### A. The GWG Holdings L Bonds Prospectus that Claimants Agreed and Acknowledged That They Reviewed and Discussed with their Financial Advisor Outlines the Material Risks of the Investment.

The GWG Holdings L Bonds Prospectus that Claimants agreed and acknowledged that they reviewed and discussed (2020 Prospectus attached hereto as **Exhibit F**) outlines all relevant material risks to the investment. This information was and is also available at any time online through the SEC's EDGAR online service. It would have been readily available to Claimants before the alleged 2020 purchase.

As the business of GWG evolved, the 2020 Prospectus described the new business path of GWG and highlighted the change in GWG's business. "In 2018 and 2019 we consummated a series of transactions (as more fully described in this prospectus) with Beneficient [] that has resulted in a significant reorientation of our business and capital

allocation strategy towards an expansive and diverse exposure to alternative assets." *Id.* at Cover Page. The 2020 Prospectus disclosed the implications of the change in corporate structure as well as those relating to its changed business focus on the L Bond holders:

> Our assets consist primarily of our investments in Beneficient, investments in our subsidiaries (including financing receivables from affiliates) and any cash proceeds we receive from life insurance assets of our subsidiaries, and all other cash and investments we hold in various accounts. GWG Life's assets, including its equity in our subsidiary DLP IV and its beneficial interest in Life Trust, serve as collateral for our L Bonds. However, the life insurance policies held by DLP IV and Life Trust, which comprise a substantial majority of our life insurance policies, do not serve as collateral for the L Bonds. Further, the life insurance policies held by DLP IV are pledged as collateral securing the obligations under DLP IV's second amended and restated senior credit facility with LNV Corporation. The L Bonds' security interest will be structurally subordinate to the security interest in favor of our senior secured lender, together with any future senior secured lenders of ours.
>
> The assets of GWG Life, including proceeds it receives as distributions from DLP IV and derived from the insurance policies owned by DLP IV, are collateral for GWG Life's guarantee of the repayment of principal and interest on the L Bonds.

*Id.* at 7.

The 2020 Prospectus identified that GWG intended to use the net proceeds from the L Bonds sales to grow its alternative asset exposure through equity investments or loans in Beneficient and to meet other obligations, including debt obligations. GWG disclosed that Beneficient would have "broad discretion" to use proceeds of any investment and may use them to fund alternative asset financing, repay indebtedness and to pay interest and principal amounts owing under previously issued L Bonds. *Id.* at 9, 14.

In or around April 2021, GWG voluntarily suspended sales of the L Bonds as a result of two accounting questions submitted to the SEC. The final response from the SEC occurred on July 26, 2021, which caused GWG to file its Form 10-K and relevant 2021 Form 10-Qs late. During the suspension, GWG did not have access to the capital its business plan relied

upon from the sales of the L Bonds. Once it brought its filings up to date, GWG began reselling the L Bonds in December 2021. *See* Bankruptcy Filing Statement at ¶¶ 45-46, attached hereto as **Exhibit G**. L Bond sales from December 2021 to January 10, 2022, were significantly lower as a result of the SEC issuing subpoenas to selling group members which, thereafter, decided to cease offering the L Bonds. As a result, GWG was cut off from capital that it needed to fund its business, which caused GWG's default on all interests and principal payments due January 15, 2022, and thereafter. *Id.* at ¶¶ 46-47.

Beginning in August 2021, Beneficient and GWG engaged in a series of transactions to ultimately separate Beneficient from GWG. This transaction was effective as of November 29, 2021. *Id.* at ¶ 23. On April 20, 2022, GWG and certain of its affiliates, filed for Chapter 11 Bankruptcy to "preserve and maximize the value of their chapter 11 estates." *Id.* at ¶ 3. GWG believes it has "valuable, although presently illiquid, assets that, given time, should yield substantial recoveries for the Debtors and their stakeholders." *Id.* at ¶ 5. The bankruptcy is ongoing under the administration of the US Bankruptcy Court for the Southern District of Texas.

The risk disclosed in the Prospectus had, unfortunately, materialized. The Prospectus contained meaningful risk disclosures, which were updated as GWG's business evolved, warning investors that investing in L Bonds contained certain risks relating to GWG's industry, business, and structure. The Prospectus advised investors to read the Prospectus in order to determine if an investment in L Bonds was appropriate. The Prospectus disclosed that "the L bonds are not a suitable purchase for all investors. Investors are urged to read carefully the risk factors relating to our business and our Company contained in the Risk

Factors section of this prospectus." Exhibit F, 2020 Prospectus at iv, 9, 33. In the "Questions

and Answers" section of the Prospectuses, the following was asked and answered:

> Are there any risks involved in investing in this offering?
> Yes. Investing in L Bonds involves a high degree of risk. You should carefully
> review the "Risk Factors" section of this prospectus, which contain a detailed
> discussion of the material risks that you should consider before investing in
> our L Bonds.

*Id.* at viii.

The Prospectus cautioned that GWG's assets were cash and its investment in its

subsidiaries. The Prospectus made clear that the majority of life insurance assets were held

in subsidiaries but that the life insurance assets held in the subsidiaries would not be collateral

for obligations of the L Bonds. The Prospectus further warned that such facts present the risk

to investors that the collateral security may be insufficient to repay the L Bonds upon an event

of default.

Finally, the Prospectus contained clear disclosures that the L Bonds would not be

repaid first as they were not a priority security interest and were structurally junior to other

obligations:

> The Bonds will constitute secured debt of GWG Holdings. The payment of
> principal and interest on the L Bonds will be:
>
>> • pari passu with respect to payment on and collateral securing the
>> approximately $24.0 million in outstanding principal amount of Series
>> I Secured Notes previously issued by our subsidiary GWG Life, and
>> the previously issued L Bonds [];
>> • structurally junior to the present and future obligations owed by our
>> subsidiaries [] under our current senior revolving credit facility [], and
>> structurally or contractually junior to any future obligations that [the
>> subsidiaries] or other primary obligors or guarantors may have under
>> future senior secured borrowing facilities; and
>> • structurally junior to the present and future claims of other creditors
>> of [the subsidiaries], including trade creditors.

. . .

An equity ownership interest is, by its very nature, subordinate to the interests of creditors. **Therefore, although investors in the L Bonds will have a security interest in the ownership of [the subsidiaries], any claim they may have to the assets owned by such entity will be subordinate to the interests of creditors of that entity.** (Emphasis in the original.)

[]

**In addition, there is the risk that the collateral security granted for our obligations under the L Bonds may be insufficient to repay the L Bonds upon an event of default.** (Emphasis in the original.)

*Id.* at 7-8, 12-13, 22-24.

An investment in the L bonds involves significant risks, including the risk of losing your entire investment, and may be considered speculative. Importantly, we maintain senior borrowing arrangements that subordinates the right to payment on, and shared collateral securing, the L Bonds to our senior secured lenders. [] In addition, these borrowing arrangements with senior lenders restrict, and are expected to continue to restrict, our cash flows. [] These provisions will restrict cash flows available for payment of principal and interest on the L Bonds.

*Id.* at 9.

The Prospectuses warned that GWG relies on the sale of L Bonds as a principal means to raise funds needed to meet the company's stated goals. Unfortunately, this Risk Factor became a reality as a result of the lower sales of L Bonds and ultimately the inability to sell L Bonds.

The Prospectuses warned that there was no existing market for the L Bonds, it was and is not anticipated that there will be a secondary market, and there cannot be any assurance as to the liquidity of any market that may develop for the L Bonds, or the ability to sell them or the price at which they may be able to be sold. *Id.* at 9-11. Claimants acknowledged all of these risks when they made their investment decision to choose to purchase L Bonds.

**B.    Cabot Conducted Rigorous Due Diligence to Determine "Reasonable Basis" Suitability for the Sale of L Bonds.**

11

Cabot conducted rigorous due diligence to determine "reasonable basis" suitability for GWG Holdings L Bonds before approving its sale. During the course of this diligence, Cabot received and reviewed hundreds of pages of documents provided by GWG Holdings regarding their business operations and L Bonds offering. These documents outlined in detail all of the critical aspects of due diligence consideration, including financial performance, industry and market analysis, management team, valuation analysis, legal and regulatory issues, the investment structure and terms, and risk assessments of the offering. The documents even included a "No Objections Letter" from FINRA regarding the "fairness and reasonableness of the underwriting terms and arrangements…" for their offering.

Cabot also relied upon extensive third-party analysis of the security offering when assessing the suitability of the offering. Mick Law and FactRight reviewed the various offerings and drafted multiple due diligence reports on the L Bonds. *See* Third-Party Diligence Reports attached hereto as **Exhibit H**. Cabot's appropriate due diligence on GWG and its L Bonds offering complied with industry standards and regulatory requirements.

Finally, as a public company, hundreds of pages of information about GWG Holdings are and were available and accessible for all to see online. *See* SEC Reporting Documents - March 2020 10-K and May 2020 10-Q Public Filing, attached hereto as **Exhibit I**. These filings discuss in detail material risks faced by the company: including credit risk, repayment risk, interest rate risk, the potential for changes in the life insurance secondary market, the accuracy of actuarial forecasting, the solvency of life insurance companies, the risk of fraud or legal challenges to the validity of policies, and the possibility that the SEC could classify the purchase of non-variable universal life insurance policies as transactions in securities, risks related to the company's ability to raise capital, comply with debt covenants, and retain

key employees. *Id.* at 5, 8, 12, 15, 17, 22, 25, 26, 29, 32, 35, 39, 43, 48, 53-54, 60, 62, 69, 70-72, 74, 85, 90, 91-92, 94-96, 100, 105, 107-108, 111-112, 114, 118, 122, 127, 136, 138, 156, 160, 162, 175, 181, 182, 186-188, 192, 194, 198-200, 201-203, 207, 209, 218, 219, 223-225, 227, 232, 235-236, 238-239, 240. The filings discuss the possibility that the collateral granted as security for obligations under the L Bonds and Seller Trust L Bonds may be insufficient to repay the indebtedness upon an event of default (lines 151-152), the risk that the company may not be able to raise the capital it is seeking (lines 134-135), and the risk that if a significant number of holders of L Bonds and Seller Trust L Bonds demand repayment, the company may be forced to liquidate assets (lines 162-163). Claimants not only received the Prospectus laying out in detail material risks and potential benefits of the investment, they could consult this publicly available information about GWG Holdings at any time before and after the purchase of the L Bonds.

### STATEMENT OF THIRD-PARTY CLAIM AGAINST ANN LOUISE WERTS[4]

On or about June 13, 2013, Werts entered into a Financial Advisor Independent Contractor Agreement with Cabot (the "Advisor Agreement," attached hereto as **Exhibit J**). Pursuant to the Agreement, Werts contractually agreed to comply with applicable FINRA Rules, federal and state securities laws and Cabot's policies. Specifically, Werts agreed:

> Financial Advisor shall be free to exercise his or her own reasonable judgment as to those persons from whom he or she will solicit applications and orders, the methods of solicitation and the time and place of solicitation, provided, however that in such activities Financial Advisor shall conform to such supervision of CLS as required by state and federal law, the regulations and rules of the Securities and Exchange Commission and FINRA, and to such policies as may be established by CLS in order to comply with all applicable statutes, rules, and regulations governing the solicitation of applications and orders for the purchase or sale of Securities.

---

[4] Cabot incorporates by reference all preceding factual and legal allegations.

*Id.* at Section A(i).

> [S]he shall at all times serve CLS with []her best efforts, in good faith and with fidelity, and shall at all times serve and promote CLS's business and interests, shall at all times conduct business in accordance with the CLS's WSPs and CLS's rules, directives, policies and directions as are or may come to be in effect; and shall at all times conduct business in full and complete compliance with all laws, rules, regulations, directives and interpretations of CLS's supervisory [personnel];

*Id.* at Section II(xi).

> In connection with all of Financial Advisor's activities hereunder, Financial Advisor hereby agrees that he/she shall comply with the Securities Act of 1933 (''the Act''), the Securities Exchange Act of 1934 ("the Exchange Act") and the Investment Advisers Act of 1940 (the "Advisers Act") and all regulations promulgated thereunder, as well as any applicable laws and regulations of FINRA, the SEC, and any state where Securities and Insurance products will be offered for sale or purchase. Financial Advisor shall not make any statements either verbal or written regarding any Securities and/or Insurance product which are untrue or misleading, or which omit a material fact necessary in order to make statements, in light of the circumstances under which they are made, not misleading.[]

*Id.* at Section H(I).

> Financial Advisor acknowledges receipt of CLS's Written Supervisory Manual (''WSPs'' or "Compliance Manual"). Financial Advisor shall study, implement and adhere to the procedures and standards set forth in CLS's Compliance Manual, including any periodic amendments to said WSPs. Financial Advisor acknowledges to have read said WSPs prior to selling any Securities and/or Insurance product to any client. Further, Financial Advisor shall submit to and fully cooperate with an annual or other compliance review by a CLS Compliance Officer and make available all of Financial Advisor's records, transactions, procedures, files and any and all other evidence of performance to ensure compliance with CLS's Compliance Manual.

*Id.* at Section H(II).

Furthermore, Werts agreed to fully indemnify CLS as a result of any costs related to

any arbitration resulting from allegations against her:

**M. INDEMNIFICATION**

14

Upon notice of a Claim (as hereinafter defined), Financial Advisor agrees to immediately indemnify, defend, and hold CLS and/or the other members of the CLS Group harmless against any and all claims and all losses, insurance deductibles, retentions, reasonable attorneys fees, and costs related to such Claims including, without limitation, any and all investigations, regulatory actions, regulatory inquiries, [] litigation including, without limitation, discovery mediations, arbitrations [].

CLS has the right to setoff any compensation earned by Financial Advisor through CLS for defense costs, indemnity, losses, costs and expenses arising out of any Claims. further, if a lawsuit, arbitration, regulatory inquiry, or regulatory action is commenced or threatened, which could be covered under CLS's right to be indemnified, CLS bas the right, at its sole discretion, to withhold any or all of Financial Advisor's compensation earned hereunder and not yet paid to Financial Advisor to establish a reserve fund to be held by CLS to pay the anticipated and/or actual losses, claims, costs and/or expenses asserted against Financial Advisor and/or CLS and/or any other indemnified person.

A "claim" shall mean and include without limitation, [] arbitration, counterclaim or action against CLS [] related to: [] (3) Financial Advisor's violation or claimed violation of any rule or regulation of any state or federal regulatory body or self- regulatory organization such as FINRA; (4) Financial Advisor's violation or claimed violation of CLS's Compliance Manual; (5) errors or claimed errors committed by Financial Advisor; and (6) claims asserted against CLS by Financial Advisor's customers, [] as a result of acts or omissions which may have occurred before, during, or after the commencement or termination of this Agreement.

Any and all indemnified persons having a right to a defense hereunder shall have the immediate right of payment from Financial Advisor for costs and attorneys' fees related to his/her/its defense, and may seek an immediate award and payment through the legal and equitable powers of any court or arbitration panel at any time during the subject matter proceedings, and if an action or motion requesting relief under this paragraph is brought to enforce same, then claimant shall be entitled to an additional award for their reasonable attorney's fees and costs related to said motion. [] CLS's and the CLS Group's rights in this section related to defense and indemnification contained herein shall survive the termination of this Agreement.[]

Any and all indemnified persons having a right to a defense hereunder: (i) hereby reserve the absolute right to its choice of counsel at all times; and (ii) may, at its sole discretion, settle any litigation, claim, or regulatory matter without the consent of the Financial Advisor and without prejudicing CLS's rights to indemnification and defense contained herein.

• CLS's and the CLS Group's rights in this section related to defense and indemnification contained herein shall survive the termination of this Agreement. The parties hereto agree that each member of the CLS Group is a third party beneficiary of this Agreement.

*Id.* at Section M.

## A.    Count I: Breach of Contract

Werts contractually agreed to "conduct business in accordance with the CLS Written Supervisory Procedures ("WSPs") and CLS's rules, directives, policies and directions . . ." and that she "shall at all times conduct business in full and complete compliance with all laws, rules, regulations, directions and interpretations." Any failure by Werts to follow laws, rules, or regulations proved by Claimants would constitute a breach of contract on Werts' behalf, including but not limited to those relating to the suitability of investment recommendations and sales practices. As a direct and proximate result of Werts' breach of contract, Cabot has already suffered damages in litigation defense costs, as well as potential liability to Claimants at arbitration.

## B.    Count II: Indemnification

Werts contractually agreed to indemnify Cabot for all damages, reasonable attorneys' fees, and costs associated defending itself from the claims alleged in this action. Werts must indemnify Cabot for such losses because this arbitration against Cabot relates to Werts's "violation or claimed violation of any rule or regulation of any state or federal regulatory body or self-regulatory organization such as FINRA" and is therefore precisely the type of "Claim" the Agreement envisioned. The Agreement explicitly survived the end of Werts' working relationship with Cabot: "CLS's and the CLS Group's rights in this section related to defense and indemnification contained herein shall survive []." Werts' acts have caused

Cabot to incur losses, liabilities, claims, damages, or expenses, including but not limited to defense litigation costs.

## ARGUMENT

## CLAIMANT'S LEGAL CLAIMS FAIL

Claimants' claims for 1) Breach of Fiduciary Duty, 2) Negligence and Negligent Misrepresentation, 3) Breach of Contract, 4) Failure to Supervise, 5) Negligence – Violation of Regulation Best Interest are factually and legally baseless. Cabot violated none of these duties.

### A.       Cabot Breached No Fiduciary Duties to Claimants.

Claimants' breach of fiduciary duty and negligence claims must be denied because Cabot owed no fiduciary duties to Claimants. For a breach of fiduciary duty claim under Colorado law, the plaintiff must demonstrate that the defendant owed them a fiduciary duty, that the defendant breached that duty, and that the plaintiff incurred damages as a result. *See, e.g., Casey v. Colo. Higher Educ. Ins. Benefits All. Tr.*, 310 P.3d 196 (Colo. App. 2012). A fiduciary duty arises when one person is under a duty to act or give advice for the benefit of another on matters within the scope of their relationship, such as a trustee and a beneficiary. *Id.*

Claimants can claim no such special relationship: Cabot and its registered representatives operate as a broker-dealer and do not owe general fiduciary duties to Claimants under the law.

> Investment advisers and broker-dealers are subject to different sets of regulations. Investment advisers are primarily regulated under the Investment Advisers Act of 1940, but are also subject to the anti-fraud provisions of the Securities Act of 1933 (the Securities Act) and the Securities Exchange Act of 1934 (the Exchange Act). They owe a fiduciary duty to their clients. Broker-dealers are also regulated under both the Securities Act and the

17

Exchange Act, as well as rules promulgated by the Financial Industry Regulatory Authority (FINRA)--a self-regulatory organization for securities firms doing business in the United States. <u>Broker-dealers generally do not owe a fiduciary duty to their clients under federal law</u>…

ARTICLE: BROKER-DEALERS, INSTITUTIONAL INVESTORS, AND FIDUCIARY DUTY: MUCH ADO ABOUT NOTHING?, 5 Wm. & Mary Bus. L. Rev. 55, 57-58 (emphasis added, internal citations omitted).

### B.        Cabot Breached No General Duties to Claimants.

To establish a *prima facie* claim of negligence, a plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and causation (i.e., that the defendant's breach caused the plaintiff's injury). *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929 (Colo. 1997). Cabot was under no duty of care to supervise a security purchase that did not occur at Cabot. Moreover, there is no evidence that Cabot breached that duty here: Cabot operates an appropriate system of supervision for customer purchases such as this and conducted rigorous due diligence on this offering.

Cabot upholds its duty to ensure that recommendations made to its customers are suitable based on the customer's investment profile, including their financial situation, investment objectives, and risk tolerance. Cabot provides full and fair disclosure of material facts and risks associated with any investment advice rendered to clients. Investors in L Bonds affirm that they receive and discuss prospectuses outlining material risks and can also access public filings on GWG Holdings at any time online.

Cabot conducted a thorough investigation and analysis of GWG Holdings L Bonds prior to making any recommendations. This process included examining the investment's financial stability, risks, and potential benefits to ensure "reasonable basis" suitability for its customers.

Cabot made no negligent misrepresentations to Claimants. Cabot exercises reasonable

care and competence in obtaining and communicating accurate information to clients. There are no details in the Statement of Claim as to what negligent misrepresentations Cabot allegedly made.

Finally, Claimants have not and cannot show that their losses were caused by anything that Cabot did, an elemental requirement of proof. Claimants cannot demonstrate that any damages suffered are a direct or proximate result of any alleged negligence or breach of fiduciary duty by the Respondent.

### C.       Cabot Breached No Contract with Claimants.

For a breach of contract claim, the plaintiff must demonstrate that a contract existed between the parties, that the defendant breached the contract, and that the plaintiff suffered damages as a result. *See, e.g., Hemmann v. Mediacell*, 176 P.3d 856 (Colo. App. 2007). Claimants points to no contract between Cabot and Claimants that Cabot breached.

### D.       Cabot Operates an Appropriate System of Supervision in Full Compliance with FINRA Rules 3110 and 2111.

Cabot operates an appropriate system of supervision for the purchase of investments such as L Bonds that fully complies with FINRA Rule 3110. Cabot has established, maintained, and enforced written procedures to supervise the types of business in which it engages. These procedures are reasonably designed to achieve compliance with the applicable rules of FINRA. Cabot consistently works to ensure that its supervisory system is robust and effective in preventing and addressing potential issues.

Under FINRA Rule 3110, member firms like Cabot need only "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance" with both FINRA rules and state or federal securities laws, and to

"establish, maintain, and enforce written procedures" for such supervisory system that are "reasonably designed to achieve compliance" with such rules and laws. FINRA Rule 3110(a)-(b). Cabot more than meets this requirement with regard to its customers purchases of L Bonds, which are properly checked by Cabot compliance personnel before approving such purchases for customers.

Cabot has fulfilled its independent duty to properly supervise its agents and ensure compliance with all FINRA, SEC, and other regulatory rules and regulations, as well as state and federal laws. Prior to recommending any investment, Cabot and its registered representatives conduct thorough due diligence to assess the suitability of the investment for clients. Furthermore, Cabot maintains an ongoing supervisory system that monitors accounts, follows up on potential "red flags," and conducts periodic reviews.

In the case of GWG Holdings L Bonds, Cabot conducted an appropriate review and evaluation of the investment product prior to making any recommendations. Cabot maintained a diligent supervisory system throughout the period in which the L Bonds were offered.

Cabot also operates its system of supervision in full compliance with the suitability requirements of FINRA Rule 2111. FINRA Rule 2111(a) provides:

> A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

In connection with a firm's supervision relating to FINRA Rule 2111, FINRA's FAQs on Rule 2111 provides,

> In Notice to Members 99-45, FINRA said that the supervision rule 'requires that a [firm's] supervisory system be reasonably designed to achieve compliance with applicable laws and regulations. This standard recognizes that **a supervisory system cannot guarantee firm-wide compliance with all laws and regulations. However, this standard does require that the system be a product of sound thinking and within the bounds of common sense, taking into consideration the factors that are unique to a member's business.**'

*See* https://www.finra.org/rules-guidance/key-topics/suitability/faq., fn. 94, p. 17 (emphasis added).

Section 15(b)(6) of the Securities Exchange Act of 1934 provides "no person shall be deemed to have failed reasonably to supervise another person if:

> (1)    There have been established procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, any such violation by such other person, and

> (2)    Such person has reasonably discharged the duties and obligations incumbent upon him by reason of such procedures and system without reasonable cause to believe that such procedures and system were not being complied with.

15 U.S.C. § 78o(b)(4)(E).

FINRA Rule 3110(a) sets forth a broker-dealer's supervisory responsibility as follows:

> Each member shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules.

Cabot has historically operated on a business model where independent financial advisors register with Cabot and may offer certain products for which Cabot has entered into a selling agreement. Cabot pays out up to approximately 90% of all commissions generated

by sales of its registered financial advisors. Cabot at all relevant times herein had in effect a reasonable supervisory system tailored to its business, Cabot employed competent supervisory personnel, and Cabot had integrated third-party software products to aid in determining product suitability and compliance functionality to enhance its supervisory compliance.

In addition, customers are required to execute applications and acknowledgments for the investment at issue, to confirm risk tolerance, investment objectives, and understanding of the illiquidity of these investments (as well as the possibility of total loss) before proceeding with such investments.

### E.      Cabot Did Not Violate Regulation Best Interest.

Cabot complies with the provisions of Regulation Best Interest ("Reg BI") and did not violate Reg BI. Cabot has consistently fulfilled all four key obligations outlined by the regulation to its customers, namely the disclosure obligation, care obligation, conflict of interest obligation, and compliance obligation.

Disclosure Obligation: Cabot provides its customers with clear and comprehensive information about the nature of the relationship and the risks associated with various investments.

Care Obligation: Cabot exercises reasonable diligence, care, and skill in assessing the suitability of the L Bonds investment for its customers, considering their investment profile, risk tolerance, and financial objectives, with the genuine belief that it was in the customer's best interest.

Conflict of Interest Obligation: Cabot has in place policies and procedures to identify, disclose, and mitigate or eliminate conflicts of interest that could

compromise the firm's ability to act in the best interest of its retail customers.

Compliance Obligation: Cabot maintains comprehensive written policies and procedures designed to ensure compliance with Reg BI and all other applicable regulations. The firm adheres to these policies in all aspects of its operations.

Cabot conducted appropriate due diligence on the L Bonds investment and has policies in place to ensure that such purchases match a customer's specific investment profile.

### F.     Investment Performance is Not Actionable, Cabot Cannot Serve as the Insurer for Poor Investment Performance.

Claimants may be disappointed in the performance of the investment at issue; however, they cannot recover losses in the absence of an actionable misrepresentation – which they has not shown. Loss is not enough: brokerage firms are not guarantors of investment performance. The securities laws are not intended to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc.*, 544 U.S. at 345. To disregard the "ordinary hazards of the stock market" and award damages for market losses would provide a clear "windfall" to Claimants. *Miley v. Oppenheimer & Co.*, 637 F.2d 318, 327-29 (5th Cir. 1981). Such an approach would quickly bankrupt the industry.

Indeed, courts routinely hold that losses caused by market conditions are not actionable. *See Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (holding there was no viable securities claim where decline in defendant's stock price was caused by "changing market conditions, changing investor expectations, or other unrelated factors"); *Druskin v. Answerthink*, Inc., 299 F. Supp. 2d 1307, 1339 (S.D. Fla. 2004) ("Plaintiffs have failed to allege with specificity that [d]efendants' fraud, as opposed to general market

conditions, caused the stock price to decline."); *Platsis v. E.F. Hutton & Co.*, 642 F. Supp. 1277, 1299 (W.D. Mich. 1986) ("[P]laintiff's monetary loss was the direct result of external market conditions and not the results of any misrepresentations or omissions which may have been made."), *aff'd*, 829 F.2d 13 (6th Cir. 1987).

Here, Claimantss allegations are a clear example of attempting to prove "negligence" and misrepresentation by hindsight performance analysis of an investment. But "[h]indsight is not the test for securities fraud." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997); *see also In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 468 (S.D.N.Y. 2004) (dismissal of "fraud by hindsight" claims); *In re Merrill Lynch & Co. Rsch. Reports Sec. Litig.*, 273 F. Supp. 2d 351, 376 (S.D.N.Y. 2003) ("recommendation to 'buy' a stock is necessarily forward-looking because whether the stock price will appreciate is dependent on the unknowable variable of the future stock price").

Even assuming as true that Claimants lost money in this investment, such loss was due to factors that were outside of Cabot's control. "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions" like the ones at issue to "pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). Although it may be tempting to look backward with perfect 20/20 hindsight to determine precisely what choices should have been made based on subsequent events, a claim must be adjudicated upon facts that existed "as of the time of the transaction," not based on "a 20/20 hindsight view long after the event." *Jaroslawicz v. Engelhard Corp.*, No. 84-3641 (CSF), 1989 U.S. Dist. LEXIS 3332, at *15-16 (D.N.J. Apr. 5, 1989). "Hindsight bias" is the "tendency for individuals to overestimate or exaggerate the

predictability of events after they have occurred." *Chavez v. City of L.A.*, 224 P.3d 41, 52 (Cal. 2010).

The investment documents that Cabot's customers executed "bespoke caution." Claimants were provided prospectuses and disclosure documents for GWG, a public company filing periodic reports with the SEC. These documents contained clear, unambiguous language warning of the risks of the investments. Further, Claimants executed representations and acknowledgements as to their review and understanding of the risk factors and other disclosures contained in the prospectus. As such, Claimants are held to the legal standard of "bespeaks caution" and cannot shirk such obligations when it suits them.

Generally, where an investor receives a prospectus or other offering document which "bespeaks caution" – as did all of Cabot's L Bonds customers – the law is clear that such specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue [] nullify any potentially misleading effect. *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, at 676 (D. Colo. 2007) ("The bespeaks caution doctrine is a judicially created doctrine providing that forward-looking representations are ... immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statement at issue to nullify any potentially misleading effect.") (cleaned up); *Grossman v. Novell, Inc.*, 120 F.3d 1112, at 1120 (10th Cir. 1997) ("Forward-looking representations are also considered immaterial when the defendant has provided the investing public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect. This doctrine, which is called the "bespeaks caution" doctrine, provides a mechanism by which a court can rule as a matter

of law that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.") (cleaned up); *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, at 1297 (D. Colo. 2013), aff'd, 776 F.3d 1103 (10th Cir. 2015)(internal citations omitted) ("When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.") (cleaned up).

In *Zobrist v Coal-X, Inc.*, 708 F.2d 1511 (10th Cir. 1983), the Tenth Circuit held that the memorandum provided to the investor, which the investor acknowledged receipt of and signs subscription documents and questionnaires acknowledging he understood the nature of the investment, expressly contradicted the broker's representations and thus had constructive knowledge of the risks and warnings contained in the Private Placement Memorandum:

> knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents. We thus hold that [the investor] must be charged with constructive knowledge of the risks and warnings contained in the Private Placement Memorandum.

*Zobrist* at 1518.

Similar to *Zobrist*, Claimants were competent adults and acknowledged that they had received, reviewed and understood the GWG prospectuses relating to their L Bond investments. Each of the prospectuses disclosed the risk factors relating to the subordination of the L Bond investors to other creditors, the L Bonds were not intended to have any public trading market, had automatic renewal, had insufficient collateral to cover the obligations under the L Bonds and that proceeds from the L Bond offerings would be used to pay

principal amounts owing under previously issued L Bonds. Sadly, some of these disclosed risk factors are exactly what came to fruition and resulted in the default on the L Bonds.

**G.      There is No Private Right of Action for Alleged Breaches of FINRA Rules.**

It is well-established that there is no private cause of action based on an alleged violation of industry rules. *See, e.g., Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1419 (11th Cir. 1983) (There is no private cause of action under federal securities laws for violation of the New York Stock Exchange 'know your customer' rule or the National Association of Securities Dealers 'suitability' rule'); *Rolf v. Blyth*, 570 F.2d 38, 43 n.6 (2d Cir. 1978) (holding there is no private right of action for violation of the provisions of the rules of fair practice of the NASD, NYSE, or the AMEX).[5]

Nor can Claimants seek to bring a claim for violation of industry rules in the guise of a negligence claim. *See, e.g., Lantz v. Priv. Satellite Television*, 813 F. Supp. 554, 556 (E.D. Mich. 1993) (rejecting negligence claim based on alleged violation of securities industry rules because "[t]hese rules do not create duties to breach of which are actionable by a customer."). For all of these reasons, Claimants' claims based on purported violations of FINRA industry rules are without merit and must be dismissed.

## AFFIRMATIVE DEFENSES

In addition to the facts set forth above, Claimants' claims against Cabot must be dismissed for the following reasons:

---

[5] *See also Craighead v. E.F. Hutton & Co., 89*9 F.2d 485, 493 (6th Cir. 1990) (holding that there is no private cause of action for violations of NYSE rules); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 680-81 (9th Cir. 1980) (rejecting implied claim based on SRO rules requiring "just and equitable principles of trade"); *Pyle v. White*, 796 F. Supp. 380 (S.D. Ind. 1992) (holding there is no private cause of action for violation of securities industry rules); *Knight v. E.F. Hutton & Co.,* 750 F. Supp. 1109, 1113 (M.D. Fla. 1990) (same).

1.      The SOC fails to set forth any viable claim upon which relief can be granted as against Respondent.

2.      Claimants expressly assumed the risks inherent in the transactions at issue and of the damages or losses alleged by entering into the transactions at issue.

3.      Any losses suffered by Claimants were not caused by any action or omission of Cabot, but rather, were caused by their own decisions, the decisions of third parties, market conditions, and other factors outside the control of Cabot and for which Cabot cannot be held responsible.

4.      Claimants failed to take reasonable steps to mitigate their alleged damages or losses.

5.      Claimants cannot establish reasonable reliance, loss causation, and/or proximate cause deriving from any conduct of Cabot.

6.      Claimants' losses were caused by factors other than Cabot's conduct.

7.      At all times material, Claimants understood and accepted the risks associated with the transactions at issue. Claimants specifically assumed the risks of those transactions and ratified the transactions. In light of Claimantss knowing acceptance of the transactions at issue and the assumption of the risk associated with same, Claimants waived, or are estopped from bringing, any claim for relief and are barred from recovery under the doctrines of waiver and estoppel.

8.      Cabot did not breach any duty to Claimants imposed by operation of law or contract.

9.      Cabot is not liable to Claimants in any amount because, at all relevant times, it acted properly, in good faith, and in a commercially reasonable manner.

10.     Claimants' damage claims against Cabot are entirely speculative and improper.

11.     Claimants failed to exercise reasonable or ordinary care, caution, or prudence with respect to the matters alleged in the SOC. Accordingly, Claimants are barred from obtaining any award, in whole or in part, by reason of their contributory and/or comparative negligence.

12.     Claimants' losses, if any, were not proximately caused by Cabot.

13.     Claimants have no legal or factual right to recover statutory interest against Cabot.

14.     Claimants' claims are barred in whole or in part by the doctrines of waiver and unclean hands.

15.     Claimants' claims are ineligible for arbitration under FINRA Rule 12206.

16.     Claimants' claims are barred by applicable state and federal statutes of limitation.

17.     Claimants explicitly indemnified Respondent in account opening documents.

## **RESERVATION OF RIGHT TO AMEND**

Cabot reserves the right to amend its Answer and assert additional defenses once more information becomes available, including information obtained through discovery from Claimants, Ms. Werts, and other interested or related parties.

## **CONCLUSION**

Claimants have failed to allege any basis for liability against Cabot. For the foregoing reasons, Cabot respectfully requests that the Arbitrator dismiss the Claim in its entirety and award Cabot compensatory damages in connection with its third-party claim against Werts.

Dated: April 21, 2023

By: */s/ James Baehr*
James Baehr

Address:
609 Metairie Rd, #8162
Metairie, LA 70115
Tel: 504-475-8407
Email: james@baehr.law

*Attorney for Respondent*
*Cabot Lodge Securities, LLC*